773 F.Supp.2d 351 (2011)
In re CURRENCY CONVERSION FEE ANTITRUST LITIGATION.
This Document Relates to:
Robert Ross and Randal Wachsmuth, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
American Express Company, et al., Defendants.
MDL No. 1409. No. 04 Civ. 5723(WHP).
United States District Court, S.D. New York.
March 29, 2011.
*353 Ann D. White, Michael J. Kane, Mager White & Goldstein, LLP, Jenkintown, PA, Linda P. Nussbaum, Gregory Keith Arenson, Kaplan Fox & Kilsheimer LLP, New York, NY, Marc Howard Edelson, Hoffman & Edelson, L.L.C., Doylestown, PA, R. Scott Palmer, Berman, Devalerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, Charles Pearsall Goodwin, Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA, Christopher M. Burke, Kristen M. Anderson, Scott Scott, LLP, San Diego, CA, for Plaintiffs.
Elizabeth L. Grayer, Evan R. Chesler, Cravath, Swaine & Moore LLP, New York, NY, Jamie Lauren Berger, Akin Gump Strauss Hauer & Feld LLP, Houston, TX, for Defendants.

MEMORANDUM & ORDER
WILLIAM H. PAULEY III, District Judge:
Plaintiffs Robert Ross and Randal Wachsmuth bring this class action asserting Sherman Act violations against Defendants American Express Company, American Express Travel Related Services and American Express Centurion Bank (collectively, "Amex"). Specifically, Plaintiffs allege that Amex and its competitors con *354 spired to fix foreign currency conversion fees (the "FX Fee") and to impose arbitration clauses in cardholder agreements. Amex moves for summary judgment on all claims. For the following reasons, Amex's motion is denied.

BACKGROUND[1]

I. Procedural Background

Plaintiffs hold Visa- or MasterCard-(the "Networks") branded credit cards issued by one or more of the following banks: Citibank (South Dakota) N.A., Universal Bank, N.A., Universal Financial Corp, and Citigroup Inc. (collectively, "Citi"); Bank of America Corporation and Bank of America, N.A. (USA) (collectively, "Bank of America"); First USA Bank, N.A. and Bank One Corporation (collectively, "First USA"); J.P. Morgan Chase & Co., Chase Manhattan Bank USA, N.A., and the Chase Manhattan Bank (collectively, "Chase"); Providian Financial Corp., Providian National Bank, and Providian Bank (collectively, "Providian"); Household International, Inc. and Household Bank (SB), N.A. (collectively, "Household"); and MBNA Corporation and MBNA America Bank, N.A. (collectively, "MBNA", and together with the other banks, the "Banks"). Prior to this lawsuit, Plaintiffs, the Networks and the Banks were engaged in a multi-district litigation titled In re Currency Conversion Fee Antitrust Litigation, MDL No. 1409 (the "MDL Proceeding"), in which Plaintiffs claimed that the Networks and the Banks conspired to fix FX Fees.
On July 22, 2004, Plaintiffs filed this action alleging that Amex also participated in the price-fixing conspiracy charged in the MDL Proceeding. Plaintiffs also claimed that Amex conspired with the Banks to include compulsory arbitration clauses in cardholder agreements.
Finally, in a separate action, Ross v. Bank of America, et al., 05 Civ. 7116, Plaintiffs brought their arbitration clause conspiracy claim against the Banks. Several of the Banks have settled by agreeing to remove the arbitration clauses from their cardholder agreements for a period of three and a half years.

II. Factual Allegations

a. The Credit Card Networks & FX Fees

Visa, MasterCard and Amex are the three largest general-purpose credit card networks in the United States. (Declaration of Elizabeth L. Grayer dated Apr. 30, 2010 ("Grayer Decl.") Ex. A: Expert Report of Frederic M. Scherer dated Oct. 15, 2005 at ¶ 3.) The Visa and MasterCard networks operate differently from Amex's network. (Defs.' Statement Pursuant to Local Civil Rule 56.1 ("Defs. 56.1 Stmt.") ¶¶ 7-8; Pls.' Statement Pursuant to Local Civil Rule 56.1 ("Pls. 56.1 Stmt.") ¶¶ 7-8.) In the Visa and MasterCard networks, customer- and merchant-related responsibilities are apportioned: third-party banks issue cards and maintain relations with cardholders, while Visa and MasterCard process cardholder transactions and interface with merchants. (Defs. 56.1 Stmt. ¶ 7; Pls. 56.1 Stmt. 117.) In contrast, Amex *355 operates a "closed loop" network in which it maintains direct relations with both cardholders and merchants and processes all transactions. (Defs. 56.1 Stmt. ¶ 8; Pls. 56.1 Stmt. ¶ 8.)
Visa, MasterCard, Amex and the Banks all assess an FX Fee on cardholder transactions. (Defs. 56.1 Stmt. ¶ 6; Pls. 56.1 Stmt. ¶ 7.) Visa and MasterCard cardholders pay two separately assessed fees: 1% of the foreign transaction to Visa or MasterCard and typically 2% of the transaction to the Banks. (Defs. 56.1 Stmt. ¶ 7; Pls. 56.1 Stmt. ¶ 7.) Amex assesses a single fee equaling 2% of the transaction. (Defs. 56.1 Stmt. ¶ 8; Pls. 56.1 Stmt. ¶ 8.)

b. Amex's Pricing Studies and Prior Evaluations of the FX Fee

In the mid- to late-1990s, Amex conducted biennial studies of its competitiveness in the credit card market. (Declaration of Kevin C. Aldridge dated June 10, 2010 ("Aldridge Decl") Ex. 18: Deposition of Jay B. Stevelman dated Sept. 21, 2005 ("Stevelman Dep.") at 23-24.) These studies included an evaluation of FX Fees charged by Amex's competitors and typically required between six and nine months to complete. (Aldridge Decl. Ex. 1: Deposition of Peter C. Sisti dated Nov. 16, 2004 and Dec. 13, 2004 ("Sisti Dep.") at 23-24; Ex. 16: Deposition of Nika Jasal dated Sept. 16, 2005 ("Jasal Dep.") at 29.) Amex executive Peter Sisti ("Sisti") testified that Amex's pricing studies "would have been the most significant" source of information regarding pricing by Amex's competitors. (Sisti Dep. at 72-73.) According to Plaintiffs, these studies formed the basis for Amex's pricing decisions in the past. (Pls. 56.1 Stmt. ¶ 71 (citing various exhibits).) In 1999, Amex had a study underway that was scheduled to be completed in June of that year. (Jasal Dep. at 272-73.)
Until 1999, Amex charged an FX Fee of 1%. (Defs. 56.1 Stmt. ¶ 10; Pls. 56.1 Stmt. ¶ 10.) However, before that time Amex had contemplated increasing that fee. For example, in March 1997, Amex's "Pricing Opportunities Task Force" identified a 1% increase in its FX Fee as a potential source of revenue. (Aldridge Decl. Ex. 21: Deposition of Phillip J. Riese dated June 28, 2005 ("Riese Dep.") at 44-45; Ex. 23: Deposition of Mary F. Miller dated June 3, 2005 ("Miller Dep.") at 76; Ex. 24: Memorandum from M. Miller to Dan Austin, et al. dated Mar. 3, 1997 at Bates No. AMX30005683.) This proposal arose out of a financial analysis conducted by Amex's Treasury Department and was the subject of several memoranda to Amex executives, including then President and Chief Executive Officer Kenneth Chenault. (Pls. 56.1 Stmt. ¶ 11e; Aldridge Decl. Ex. 26: Memorandum from M. Miller to S. Alesio, et al. dated Apr. 1, 1997; Ex. 27: Memorandum from M. Miller to K. Chenault dated Apr. 17, 1997 ("Chenault Memo").) Amex ultimately rejected the proposal out of concern that it would drive away customers. Specific concerns included the fear that "higher pricing weakens the distinctive positioning of the Card as the travel product of choice." (Miller Dep. at 142; Chenault Memo at Bates No. AMX2 000514.)
In 1998, Amex retained a consultant to formulate proposals for generating additional revenue. (Aldridge Decl. Ex. 2: Deposition of Philip B. Hayden dated June 9, 2005 ("Hayden Dep.") at 88-89, 93-95.) A draft interim report dated September 25, 1998 proposed, among other things, an increase in Amex's FX Fee. (Aldridge Decl. Ex. 31: Amex Profitability Review Interim Report dated Sept. 25, 1998 at Bates No. AMX30005686.) According to Plaintiffs, Amex continued to evaluate the possibility of an FX Fee increase into 1999. (Pls. 56.1 Stmt. ¶ 13c.) For example, minutes *356 from a February 11, 1999 Amex staff meeting include the following entry:
Foreign Exchange: If we implement, we will be more expensive than competition. . . . Julia: we were competitive a year ago but now we are 15 BP worse than competitors. Many other issuers cannot raise because their processor . . . does not have the capability yet. Consensus is that when they get the capability the issuers will raise rates. Gail mentioned that if we raise there could be negative publicity. Gil suggested waiting until [the] study came out before implementation. Decision needs to be made on this.
(Aldridge Decl. Ex. 33: Email from D. Patron to A. Ruediger, et al. dated Feb. 16, 1999 at Bates No. AMX30012816.)
Plaintiffs submit that in 1999 Amex was gathering non-public information about the FX Fees charged by its competitors. Specifically, Plaintiffs cite a March 4, 1999 memorandum from Amex executive Jim Bush ("Bush"), discussing Amex's reconnaissance of its competitors' FX Fees:
[A]s you requested, attached is a grid that details for comparison the pricing levers across some of our key competitors . . . . Specifically for Foreign Charge conversions, we have been able to formally identify Citi, First USA, and Providian as making the change to the conversion commission rate . . . . At this stage, our best intelligence indicates that Chase, Capital One, and MBNA will follow.
(Aldridge Decl. Ex. 60: Memorandum from J. Bush to A. Kelly dated Mar. 4, 1999 at Bates No. AMX 001435.) While Plaintiffs also cite Sisti's deposition testimony, he stated that Amex's awareness of certain FX Fee initiatives by Citi and First USA would have come from "information that [Amex was] picking up in the media . . . ." (Sisti Dep. at 366.)

c. The May 25, 1999 Meeting

Plaintiffs' price-fixing allegations center largely on a May 25, 1999 meeting (the "May 25 Meeting") at the offices of Wilmer Cutler & Pickering LLP ("Wilmer Cutler"). (Defs. 56.1 Stmt. ¶ 52; Pls. 56.1 Stmt. ¶ 52.) At that time, Wilmer Cutler served as outside counsel for Amex and certain other meeting attendees. (Defs. 56.1 Stmt. ¶ 52; Pls. 56.1 Stmt. ¶ 52.) Meeting participants included in-house counsel for Amex, Chase, Citi, First USA, Household and Providian, as well as representatives of General Electric Capital, Capital One, Nordstrom, Sears Roebuck & Co. ("Sears"), and Novus Credit Services. (Defs. 56.1 Stmt. ¶¶ 47-48; Pls. 56.1 Stmt. ¶¶ 47-48.) Bank of America and MBNA did not attend. (Defs. 56.1 Stmt. ¶ 49; Pls. 56.1 Stmt. ¶ 49.)
In a May 3, 1999 letter, Wilmer Cutler attorneys Ronald Greene ("Greene") and Christopher Lipsett ("Lipsett") provided the following introduction to the May 25 Meeting's invitees:
Wilmer[ ] Cutler ..., in cooperation with credit card counsel from [Citi, First USA, Amex, and Sears], would like to invite you to join us for an informal meeting of senior in-house credit card counsel representing the various segments of the U.S. credit card business. The purpose of the meeting will be to share views and experiences relating to legal issues of common concern to all the companies making up this diverse and dynamic industry, including a variety of legislative, regulatory, and litigation-related developments.
We have no firm views about the appropriate structure and agenda for such a meeting and would appreciate receiving suggestions and comments from everyone who might be interested in attending. We recognize, of course, that the *357 companies sending counsel to such a meeting are competitors, and that for legal reasons certain issues will need to remain off-limits. But in initial discussions with the four co-sponsoring firms, a consensus quickly emerged that there was a need for a broader exchange of views and experiences among industry counsel than has been possible through other forums . . . . There also was a consensus that the meetings should not focus, at least exclusively, on prepared presentations on pre-assigned topics. While an agenda needs to be circulated in advance . . . and while we might assign to particular participants certain issues about which they would be prepared to lead a discussion, we would hope the meetings would be open and free-flowing, and would allow full participation by all counsel attending.
(Aldridge Decl. Ex. 46: Letter from R. Greene and C. Lipsett to J. Burak dated May 3, 1999 at Bates No. HH 01757.) The agenda did not include the FX Fee or related disclosure obligations. (Defs. 56.1 Stmt. ¶ 55; Pls. 56.1 Stmt. ¶¶ 54e, 55; Grayer Decl. Ex. Y: Agenda for the May 25 Meeting at Bates No. WCP 0036.)
While the parties agree that FX Feerelated issues were raised during the May 25 Meeting, they dispute the extent of those discussions. The parties agree that Greene expressed the view that the Truth In Lending Act ("TILA") did not require a company to disclose its FX Fee on monthly billing statements. (Defs. 56.1 Stmt. ¶ 57; Pls. 56.1 Stmt. ¶ 57) Greene referred to an Amex billing statement as an example, telling attendees that Amex did not disclose its FX Fee. (Defs. 56.1 Stmt. ¶ 57; Pls. 56.1 Stmt. ¶ 57) To demonstrate the limited nature of the discussion, Amex cites the deposition testimony of Robert Birnbaum ("Birnbaum"), in-house counsel for Chase, who testified that "[t]he discussion [about disclosure obligations attendant to the FX Fee] generally was between [Birnbaum] and Ron Greene." (Grayer Decl. Ex. UU: Deposition of Robert Birnbaum dated July 15, 2004 at 86; Defs. 56.1 Stmt. ¶ 58; Pls. 56.1 Stmt. ¶ 58.) Amex also cites deposition testimony of Joanne Sundheim ("Sundheim"), in-house counsel for First USA, who testified that the discussion concerning FX Fee disclosure issues lasted approximately fifteen minutes. (Aldridge Decl. Ex. 10: Deposition of Joanne Sundheim dated Nov. 18, 2003 ("Sundheim Dep.") at 204-05; see also Defs. 56.1 Stmt. ¶ 56.) Amex submits further that in-house counsel Timothy Heine was the only Amex representative present at the May 25 Meeting, and that he "never commented on Mr. Greene's remark about [Amex's] disclosure practice." (Defs. 56.1 Stmt. ¶¶ 51, 59.) Moreover, Amex executives James Bush and Alfred Kellywho Amex submits had pricing authority over its FX Feedid not attend. (Defs. 56.1 Stmt. ¶¶ 60-61; Pls. 56.1 Stmt. ¶¶ 60-61.) Finally, Amex argues that "[t]here is no evidence of any discussion of FX [Fee] pricing at the [M]eeting." (Defs. Br. at 11 (emphasis added).)
In contrast, Plaintiffs assert that FX Fees and disclosure issues were discussed extensively. Plaintiffs rely heavily on the deposition testimony of Sundheim and her notes from the May 25 Meeting. Those notes state in pertinent part:
[Foreign] Currency. [Currency] Conversion rate. Calculated per a formula, wholesale rate. 1% Visa. 2% FUSA. Matter of contract law. Amex [does not] disclose. Regulators [never] say anything. ButAmex does disclosures. Ron [Greene] doesn't think it matters who actually converts.
(Aldridge Decl. Ex. 48: Sundheim notes at Bates No. FUSA 017606-017607; Sundheim Dep. at 207-08.) Sundheim could *358 not recall whether she and other meeting attendees discussed the fact that First USA was charging a 2% fee. (Sundheim Dep. at 208.) She testified further that Susan Lau, in-house counsel for Providian, expressed her view that the FX Fee was not a cost of credit and therefore not related to the issuance of credit under Regulation Z.[2] (Sundheim Dep. at 213-14.)
Plaintiffs also cite the meeting notes of Janet Burak, in-house counsel for Household, which state: "Increase Some banks imposing foreign ex Δ conversion rateis it a finance charge or an `other charge' (which needs to be specifically disclosed) Ron says only a currency conversion rate, charged based on formula that incorporates Visa/MC'd charge &plus; [unknown] charge, but not a finance charge or other charge." (Aldridge Decl. Ex. 49: Notes of Janet Burak at HH 01761.)

d. The FX Fee Increases

Plaintiffs allege that Amex and certain Banks finalized their decisions to increase or implement their FX Fees in or around May 1999 as evidenced by parallel price increases in the months following the May 25 Meeting. While the timing of most of the Banks' FX-Fee related notices and decisions is largely uncontested, the parties disagree sharply about when Amex and Chase decided to increase their FX Fees.

i. Amex

Amex submits that it decided to raise its FX Fee to 2% sometime in early 1999 prior to the May 25 Meeting. In support of this assertion, Amex relies on the deposition testimony of Bush, who stated that Amex began evaluating a potential FX Fee increase in late 1998 and that in "that time frame" his supervisor Al Kelly accepted his recommendation to raise the fee. (Grayer Decl. Ex. H: Deposition of James Bush dated January 26, 2005 ("Bush Dep.") at 17, 26. 35-36.) It is undisputed that by April 1999, Amex had begun mailing announcements to its cardholders stating that "[e]ffective June 15, 1999, if you initiate a transaction in foreign currency, it will be converted into U.S. dollars on the date it is processed by us or our agents at a rate set by us based on interbank, tourist, or . . . official rate, increased in each instance by up to 2%." (Grayer Decl. Ex. V: Other Changes to Cardmember Agreements; Ex. W: Sisti Dep. at 385.) Amex also cites a document titled "FYI April 99Changes to Terms & BenefitsPress Q & A," which states in part:
[Q.] Is [Amex] raising its foreign currency conversion fee? Why?
[A.] Yes. The conversion fee is going from one percent to two percent to improve economics associated with providing currency conversion services. There are administrative costs and foreign exchange risks associated with providing conversion for the millions of transactions made in foreign markets.
(Declaration of Evan R. Chesler dated Sept. 3, 2010 ("Chesler Decl.") Ex. A: Q & A Document at Bates No. AMX30008769.)[3]
Plaintiffs submit that even though Amex announced an FX Fee increase in April *359 1999, that increase was not finalized until after the May 25 Meeting. Plaintiffs cite a March 25, 1999 memorandum from Jay Stevelman ("Stevelman"), Amex's Senior Vice President and Treasurer of Travel Related Services, to Sisti concerning Amex's analysis of its competitors' FX Fees. Stevelman included a note stating "Peter, Do we know what we're doing?" (Aldridge Decl. Ex. 15: Memorandum from C. Paiazzolo to J. Stevelman dated Mar. 25, 1999.) Stevelman testified that in late March Amex was focused on gathering competitive information and agreed it was possible that Amex was still considering the decision to impose an FX Fee. (Stevelman Dep. at 120.)
Plaintiffs also cite a document titled "Variable FX Conversion Mark-up Project, Meeting 28th May 1999" (the "May 28 Outline"), which states that "NY Treasury & CSG have confirmed subsequent to the meeting that an FX increase will be implemented regardless of results from the FX competitive study." (Aldridge Decl. Ex. 32: May 1999 Meeting Outline ("May 28 Outline") at Bates No. AMX30007227.) It stated further: "US CSG to advise NJ by Friday 4th June the level of increase." (May 28 Outline at Bates No. AMX30007227.)
In addition, Plaintiffs cite a composite exhibit comprised of several separate documents. (Aldridge Decl. Ex. 60.) A portion of that exhibitan undated presentation captioned "Variable FX Rate" states: "CCSG in U.S. estimate that increase in FXCF from 1% to 2% results in PTI benefit of $58m on U.S. outspend. Justification of increase being investigated through 1999 FX competitor rate study." (Aldridge Decl. Ex. 60 at Bates No. 001424.) The parties disagree over whether this presentation is part of a May 21, 1999 presentation that immediately precedes it in Bates number.
Finally, Plaintiffs cite a June 10, 1999 memorandum concerning Amex's "FX Rate InitiativesStatus Update" (the "June Memo"), authored by an executive responsible for the Europe, Middle East and Africa markets. That memorandum states in part:
Following my previous note to you dated 29th March, I am now able to update you on the Treasury FX Competitor Rate Study and Variable FX rate initiative.
. . .
US FX ChangesCCSG in the U.S. have made a decision to increase their foreign exchange mark up from 1 to 2% for all U.S. outspend effective July 1, 1999. This date has been accelerated from the planned mid July date due to timely completion of the EMEA [Europe, Middle East and Africa] systems development and concerted effort by the EMEA project team.
(Aldridge Decl. Ex. 62: Memorandum from J. White to P. Godfrey et al. dated June 10, 1999 at Bates No. AMX 015026.) Stevelman conceded that the manner in which Amex increased its FX Fee was "not common" and was "not the same as the [pricing] changes [Amex] made before.. . ." (Stevelman Dep. at 117-18.)
On at least one other occasion, Amex notified customers of a pricing change that it did not implement. Specifically, Amex sent its customers a change-in-terms notice regarding a return balance transfer check fee but never imposed the fee because the implementation process "was more complicated ... than was [previously] told to the team . . . ." (Hayden Dep. at 138-40.)

ii. Chase

Amex submits that Chase decided to increase its FX Fee in April 1999. Amex relies on the testimony of Harry DiSimone *360 ("DiSimone"),[4] Chase's Chief Operating Officer of Credit Cards, (see Defs. Reply at 7), who testified that he "believe[d Chase] decided to go forward in April with executing on a plan to initiate the [FX Fee.]" (Grayer Decl. Ex. R: Deposition of Harry F. DiSimone dated Nov. 12, 2004) ("DiSimone Dep.") at 42-43., DiSimone testified further that he "believe[d] it was either June or July [in which] Chase would have provided some notice to some of [its] partners that [it] planned on making a change of terms to institute the fee, co-brand partners and the like . . . . [And] around August or so that [Chase] decided on an execution plan for the change in terms." (DiSimone Dep. at 43.)
According to Plaintiffs, Chase was still considering whether to charge a 1% or 2% fee prior to the May 25 Meeting and did not decide to adopt an FX Fee until shortly afterward. Plaintiffs cite the testimony of Stephen Farrell, an executive in Chase's Pricing Group (see Pls. Opp'n Br. at 10), who stated that Chase had performed revenue projections at various potential FX Fee rates and "thought it was around [the] second quarter of 1999" that Chase determined it would assess the fee at 2%. (Aldridge Decl. Ex. 40: Deposition of Stephen J. Farrell dated Apr. 21, 2004 at 82-83.) In addition, Plaintiffs rely on a May 27, 1999 letter in which a Chase vice president "authorize[d MasterCard] to implement a [2% increase] to foreign currency exchange rates for [certain] Chase Debit Card[s]." (Aldridge Decl. Ex. 41: Letter from C. Salmon to K. Beale dated May 27, 1999 at Bates No. CHA-003929.) And in a May 28, 1999 instruction to Chase's card issuing processor (see Grayer Reply Decl. Ex. C: Deposition of Harry F. DiSimone dated Nov. 12, 2004 at 52), Chase "request[ed] that for all Foreign transactions made by its credit card customers, a 2% item fee should be charged." (Aldridge Decl. Ex. 42: Farrell Dep. Ex. 260 at MDL No. 1409 FDR 00375-00376.) It is undisputed that Chase began imposing a 2% FX Fee between November 1999 and January 2000. (Defs. 56.1 Stmt. ¶ 34; Pls. 56.1 Stmt. ¶ 34.)

iii. Providian

In July 1998, Providian instituted a 4% FX Fee on certain of its cards. (Defs. 56.1 Stmt. ¶ 20; Pls. 56.1 Stmt. ¶ 20.) However, in an August 1999 document titled "Important Information About Your Providian Account," Providian stated that it had "lowered the conversion fee on transactions made in a foreign currency with [its] Providian card to only 3%. Of this amount, Visa or MasterCard receives a standard fee of 1%, and Providian receives a fee of 2% for processing services." (Aldridge Decl. Ex. 63: Providian document at Bates No. PFC 2840; see also Grayer Decl. Ex. AA: Providian Press Release dated Oct. 5, 1999 at Bates No. PFC 3612; Defs. 56.1 Stmt. ¶ 21; Pls. 56.1 Stmt. ¶ 21.)

iv. Citi

Citi began considering an FX Fee as early as June 1998. (Defs. 56.1 Stmt. ¶ 22; Pls. 56.1 Stmt. ¶ 22.) In a September 1998 change-in-terms notice, Citi informed its cardholders that it would increase Visa's and MasterCard's 1% FX Fee up to 2%. (Defs. 56.1 Stmt. ¶ 23; Pls. 56.1 Stmt. ¶ 23; Grayer Decl. Ex. M: Citibank Notice of Changes dated September 1998 at Bates No. C 004286.) According to Plaintiffs, "Citi delayed implementation of its FX Fee because of complications related to programming its card operating systems to hide the FX Fee on billing *361 statements." (Pls. 56.1 Stmt. ¶25a (citing Aldridge Decl. Ex. 157: Email from J. Wesselman to S. Kietz dated Oct. 14, 1998 ("We have been advised that [the 2% FX Fee] project will be a major endeavor. Bundling the fee into the transaction will cause major systems revisions especially when the cardmember calls to dispute and the transaction needs to be charged back to the merchant.")); see, e.g., Aldridge Decl. Ex. 160: Email from B. Reynolds to S. Bridge, et al. dated Dec. 7, 1998 at Bates No. C 000560 ("The 2% Fee requirements will not be baselined today or tomorrow morning as scheduled. As you know, there is conflict about the direction of this project. . . ."); Ex. 161:1ST Monthly Project Status Report at Bates No. C 002647 (stating that the 2% FX Fee project was "behind schedule").)
On December 20, 1998, the New York Times reported Citi's announcement of its FX Fee. (Defs. 56.1 Stmt. ¶24; Pls. 56.1 Stmt. ¶24.) In April 1999, Citi began imposing a 2% FX Fee on its consumer cards but not on its Choice accounts or Universal cards. (Defs. 56.1 Stmt. ¶25; Pls. 56.1 Stmt. ¶ 25.) In September 1999, Citi instituted a 2% FX Fee on its Universal cards. (Defs. 56.1 Stmt. ¶26; Pls. 56.1 Stmt. ¶26.) In July 2001, Citi began imposing a 2% FX Fee on its business accounts. (Defs. 56.1 Stmt. ¶27; Pls. 56.1 Stmt. ¶27.)

v. First USA

In February 1999, First USA distributed a notice to its cardholders stating that, "[e]ffective March 22, 1999," it would be "add[ing] an additional two percent to the [conversion charge applied] by Master-Card or Visa." (Grayer Decl. Ex. Q: Notice dated February 1999 at Bates No. FUSA 001740; Defs. 56.1 Stmt. ¶28; Pls. 56.1 Stmt. ¶ 28.) On April 25, 1999, the New York Times reported that First USA intended to impose a 2% FX Fee but had decided not to implement it immediately. (Defs. 56.1 Stmt. ¶29; Pls. 56.1 Stmt. ¶29.) In October 1999, First USA notified cardholders in their billing statements that "transactions in foreign countries will be converted to U.S. dollars under the current applicable rules of Visa, Plus or Cirrus. [First USA] may add up to 2% to [those] rate[s]. . . ." (Grayer Decl. Ex. BB: Sample Statement dated Oct. 1999 at Bates No. 000449.) In March 2000, First USA instituted a 2% FX Fee on certain cards.
According to Plaintiffs, First USA delayed implementation of its FX Fee to hide the fee on its billing statements. (Pls. 56.1 Stmt. ¶¶31, 92-93.) For example, in a March 16, 1999 email, a First USA employee stated that "First Card is planning (pending Legal's final okay) to rollout a 3% fee on foreign transactions. The fee will be imbedded in the conversion rate . . . so it will be `somewhat' transparent to the customer." (Aldridge Decl. Ex. 71: Email from R. Schwab to D. Wilkens et ano. dated Mar. 16, 1999 at Bates No. FUSA RED01017R.) Implementation was delayed because "Legal has had second thoughts." (Aldridge Decl. Ex. 71: Email from D. Mahoney to A. Arcieri dated Mar. 29, 1999 at Bates No. FUSA RED01017R; see also Ex. 75: Email from M. Harmdierks to D. Mahoney, et al. dated May 3, 1999) (noting that First USA's legal department was working on a "letter that will outline [its] concerns regarding th[e] fee"). As late as August 1999, a First USA employee noted programming difficulties due to a "legal issue requiring [the company to] supply cardholders with the conversion rate for foreign transactions. The 1% for MasterCard and Visa is included in the rate because they are considered part of interchange. The 2% for FUSA cannot be included because it is considered an add-on fee." (Aldridge Decl. Ex. 76: *362 Email from J. Jensen to R. Eiel, et al. dated Aug. 27, 1999 at Bates No. MDL No. 1409 FDR 00487.)

vi. Household

Household originally planned to notify cardholders that it would impose an FX Fee beginning in late March 1999 but postponed notification and implementation of the fee. (Defs. 56.1 Stmt. ¶37; Pls. 56.1 Stmt. ¶37.) Household's change-in-terms notice stated that, effective September 10, 2000, it would "increase the currency conversion rate [charged by MasterCard] by 2%." (Pls. 56.1 Stmt. ¶ 37b) (citing Aldridge Decl. Ex. 163: Notice undated at Bates No. HH 01765.) In November 2000, Household began imposing a 2% FX Fee on its GM cards. (Defs. 56.1 Stmt. ¶38; Pls. 56.1 Stmt. ¶ 38.)

vii. Bank of America

Bank of America apparently began considering the imposition of an FX Fee as early as January 1999. (See Grayer Decl. Ex. S: Mem. from H. Fulton to R. Hendricks dated January 26, 1999 at Bates No. BOA 15957 (containing message stating: "I am recommending adoption of your idea to charge a[FX] Fee on foreign transactions. . . . [I]t is undetermined at this time when your idea will be implemented.").) The parties agree that Bank of America approved a proposal to adopt an FX Fee of an unspecified percentage in March 1999. (Defs. 56.1 Stmt. ¶ 39; Pls. 56.1 Stmt. ¶ 39.) Nevertheless, Bank of America did not notify its customers of the FX Fee's implementation until February 2000. (Grayer Decl. Ex. GG: Sample Account Stmt. at Bates No. BOA 13782; see also Defs. 56.1 Stmt. ¶ 40; Pls. 56.1 Stmt. ¶ 40.) That notification stated: "The foreign conversion currency adjustment rate that was disclosed in your cardholder agreement sent with your February 2000 statement will become effective [ ]1/17/01." (Grayer Decl. Ex. GG: Sample Account Stmt. at Bates No. BOA 13782 (capital letters removed).)
According to Plaintiffs, Bank of America delayed implementation of its FX Fee in order to consider methods to hide the fee from customers. (See Pls. 56.1 Stmt. ¶ 41a.) In support of this assertion, Plaintiffs cite two March 27, 2000 emails documenting, inter alia, (i) "multiple issues with the FX project that are likely to impact [its implementation] date," (ii) technical concerns about "having the transaction split into principal and fee portions on the system," and (iii) "Legal's concerns with customers being able to see this split. . . ." (Aldridge Decl. Ex. 106: Emails dated Mar. 27, 2000 at Bates No. BOA 0076.) In January 2001, Bank of America began imposing its 2% FX Fee on certain cards. (Defs. 56.1 Stmt. ¶41; Pls. 56.1 Stmt. ¶ 41.)

viii. MBNA

In early 2001, MBNA distributed a notice to cardholders stating that "effective My 1, 2001," MBNA will add a 1% FX Fee to the 1% fee charged by Visa and Master-Card. (Grayer Decl. Ex. MM: Notice dated 2001; Defs. 56.1 Stmt. ¶43; Pls. 56.1 Stmt. ¶43.) In February 2004, MBNA raised the FX Fee on its corporate cards to 2%. (Defs. 56.1 Stmt. ¶45; Pls. 56.1 Stmt. ¶45.) An April 22, 2005 article describes MBNA's plan to implement a 2% FX Fee on its consumer cards. (Defs. 56.1 Stmt. ¶46; Pls. 56.1 Stmt. ¶46.)

e. Inter-firm Communications

According to Plaintiffs, in-house counsel for the Banks began communicating about the FX Fee among themselves as early as the fall of 1998. (Pls. 56.1 Stmt. ¶82.) Plaintiffs submit that Sundheim, in-house counsel for First USA, and Karla Bergeson ("Bergeson"), in-house counsel for Citi, were integral to those communications. *363 (Pls. 56.1 Stmt. ¶82.) Bergeson "received phone calls from other in-house lawyers. . . regarding disclosure issues generally" and had a "faint and unspecific recollection. . . that one or more of these calls . . . may have related to the disclosure of foreign currency conversion rates." (Aldridge Decl. Ex. 65: Supplemental Answers & Objections of [Citi] to Pls.' Second Set of Interrogatories & Requests for the Production of Documents Addressed to the Issuing Bank Defendants dated Jan. 13, 2003 ("Citi Responses") at 3; see also Ex. 66: Deposition of Karla Bergeson dated Apr. 29, 2004 at 49 (remembering receiving telephone call slips "shortly after . . . [Citi] sent out [its September 1998] change of terms notice.").) Bergeson "recall[ed] that, as a general matter, when she received calls from other lawyers with questions regarding disclosure issues, she would refer them to . . . Greene at Wilmer[ ] Cutler. . . ." (Citi Responses at 3.) She was able to remember only one of those lawyers by nameSundheim. (Bergeson Dep. at 49.)
Sundheim recalled two phone calls with Bergeson in early 1999. (Sundheim Dep. at 282-86.) During those calls, Sundheim learned of Bergeson's view that an FX Fee need not be disclosed under Regulation Z. (Sundheim Dep. at 282.) Sundheim also testified that she "probably" informed Bergeson during the call that First USA was intending to implement its own FX Fee. (Sundheim Dep. at 283-84.) In addition, Sundheim's notes from the second call reflect that she and Bergeson discussed the fact that (i) Visa was charging a 1% rate and Citi was charging a 2% rate and (ii) Citi had not received any inquiries from regulators regarding disclosure of its FX Fee. (Sundheim Dep. at 285-86.)
In December 2008, Andrew Semmelman ("Semmelman"), in-house counsel for Chase, called Bergeson after receiving Citi's change-in-terms notice. (Aldridge Decl. Ex. 68: Deposition of Andrew T. Semmelman dated July 13, 2004 and Sept. 30, 2004 ("Semmelman Dep.") at 63-64, 134-35, 314.) During their call, Bergeson and Semmelman discussed Citi's analysis of the question whether an FX Fee was subject to Regulation Z's disclosure requirements. Bergeson also mentioned that she had sought legal advice on the FX Fee from Greene at Wilmer Cutler. (Semmelman Dep. at 353-54, 405-11.) Semmelman ended the call with the understanding that Greene supported Citi's interpretation of its obligations under Regulation Z. (Semmelman Dep. at 353-54, 405-11.) Semmelman testified that Bergeson told him Providian charged an FX Fee but did not disclose it as a finance charge. (Pls. 56.1 Stmt. ¶89; Semmelman Dep. at 353-54.) Semmelman also explained that he periodically discussed legal issues with in-house counsel for Chase's competitors, but could not recall the number of times he did so. (Semmelman Dep. at 137.)
In May or June 1999, Birnbaum, in-house counsel for Chase, had a conversation with Sundheim concerning the implementation of an FX Fee. (Aldridge Decl. Ex. 47: Deposition of Robert Birnbaum dated July 15, 2004 ("Birnbaum Dep.") at 91-92, 96-97.) Prior to the May 25 Meeting, Birnbaum knew that First USA had not implemented its FX Fee because it was experiencing "programming issues," although he was unclear whether he had received that information from Sundheim. (Birnbaum Dep. at 91-92.)
Plaintiffs also submit that FX Fees were discussed at a May 20, 1999 meeting organized by First Data Resources ("FDR"), a third party credit card processor, which was attended by various financial institutions representatives, including Semmelman and JoAnn Powlus, in-house counsel for First USA. (Pls. 56.1 Stmt. ¶¶95-96; *364 Aldridge Decl. Ex. 82: CLAG Distribution List; Ex. 83: Memorandum from B. Rosenblatt to Compliance and Legal Advisory Group dated May 27, 1999 ("May Memo").) The meeting minutes summarize a "[r]oundtable discussion" as follows:
Foreign transaction fees, usually charged as a percentage of each foreign credit card transaction, which some issuers are beginning to assess. Specific issues relating to this type of fee are whether it needs to be categorized as a finance charge, and whether the fee needs to be listed as a separate line item on the cardholder statement. Members of the group were in agreement that if the transaction fee is assessed in the same manner and at the same rate on deposit accounts as credit accounts, it need not be disclosed as a finance charge. However, opinions differ regarding whether the transaction fee need be listed as a separate statement line item.
(May Memo at Bates No. CHA-007096.) Plaintiffs submit further that FX Fees were discussed at an FDR meeting in November 1999. They cite Semmelman's notes, which state: "2% foreign fee, FDR can support fee built into trans[action] amount or fee separately described on a 2nd line[.] They can't support (to date) putting fee into the APR. . . ." (Aldridge Decl. Ex. 87: Semmelman Notes at Bates No. CHA 011026.)
This Court need not summarize every piece of evidence offered by Plaintiffs in support of their assertion that the FX Fee was discussed extensively among the Banks' representatives. That is because the evidence described above is sufficient to defeat summary judgment. And Plaintiffs submit that FX Fee-related discussions continued into late 1999. (See Pls. 56.1 Stmt. ¶¶95-110; see, e.g., Aldridge Decl. Ex. 90: Email from J. Sundheim to D. Mazik dated Oct. 6, 1999 at Bates No. BONE 03165 ("I got a call yesterday from a lawyer at [Bank of America] asking how we got comfortable with the new rate. I encouraged him to join us!").) Plaintiffs also aver that, apart from communications between in-house counsel, non-attorney executives of the Banks were communicating with each other about the FX Fees or directing their attorneys to do so. (See Pls. 56.1 Stmt. ¶¶111-27.)
Finally, Plaintiffs submit that Amex and the Banks conspired to include mandatory arbitration clauses in their cardholder agreements during many of these same communications. (See, e.g., Aldridge Decl. Ex. 43: Deposition of Timothy Heine dated Feb. 19, 2004 at 233-34 (testifying that the imposition of arbitration clauses was "a topic that had been part of" the discussions with Wilmer Cutler attorneys in advance of the May 25 Meeting).) Without cataloging all of the instances in which arbitration clause-related issues were discussed among the alleged conspirators, this Court notes Plaintiffs' contention that the FX Fee and arbitration clause-related conspiracies were integrally intertwined. (See, e.g., Pls. 56.1 Stmt. ¶¶129-30) (noting that the agenda for May 25 Meeting included the following item: "Use of Arbitration Clauses in Card Agreements"); Pls. 56.1 Stmt. ¶¶131-33 (alleging that, with Amex's assistance, First USA and Citi established the "Arbitration Coalition" following the May 25 Meeting); Pis. 56.1 Stmt. ¶¶136-61 (describing meetings by the Arbitration Coalition from mid-1999 through 2003 attended by the alleged conspirators.)

DISCUSSION

I. Legal Standard

a. Summary Judgment Standard

A party seeking summary judgment must demonstrate the absence of a "genuine *365 dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Upon an initial showing that no genuine dispute exists, "the non[-]moving party must come forward with specific facts showing that there is a genuine [dispute] for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine [dispute] for trial." Matsushita, 475 U.S. at 587, 106 S.Ct. 1348 (quotations omitted). A court resolves all factual ambiguities and draws all justifiable inferences in the nonmovant's favor. Anderson, 477 U.S. at 255, 106 S.Ct. 2505.
The Supreme Court has cautioned that "antitrust law limits the range of permissible inferences from ambiguous evidence in a [Sherman Act] § 1 case." Matsushita, 475 U.S. at 588, 106 S.Ct. 1348. "To survive a motion for summary judgment . . ., a plaintiff [alleging] a violation of § 1 must present evidence `that tends to exclude the possibility' that the alleged conspirators acted independently." Matsushita, 475 U.S. at 588, 106 S.Ct. 1348 (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)); accord Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.1987). "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588, 106 S.Ct. 1348.
A plaintiff's § 1 claim must also make "economic sense." Matsushita, 475 U.S. at 587, 106 S.Ct. 1348. However, this requirement does
not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The [Supreme] Court did not hold that if the moving party enunciates any economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. Matsushita demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision. If the plaintiffs theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.
Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 468-69, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); accord Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 262 (2d Cir.2001).

b. Sherman Act Claim

Section 1 of the Sherman Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. . . ." 15 U.S.C. § 1. A plaintiff alleging a § 1 violation must demonstrate (1) an agreement or concerted action among the defendants in the (2) unreasonable restraint of trade. Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 542 (2d Cir.1993). While a plaintiff is not required to show the existence of a written agreement to prove a § 1 claim, "it is generally believed . . . that an express, manifested agreement . . . involving actual, verbalized communication, must be proved in order for a price-fixing conspiracy *366 to be actionable under the Sherman Act." In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 654 (7th Cir.2002) (Posner, J.) (collecting cases). "To prove the existence of an express, manifested agreement, the antitrust plaintiff should present `direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig., 681 F.Supp.2d 141, 166 (D.Conn.2009) (quoting Monsanto, 465 U.S. at 764, 104 S.Ct. 1464). "[A]t a minimum, the circumstances must be such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.1987) (internal quotations and modifications omitted).
Evidence of parallel conduct is probative of an antitrust conspiracy, but such evidence "alone cannot suffice." Apex Oil, 822 F.2d at 252. Rather, a plaintiff relying on parallel conduct as evidence of an antitrust conspiracy must also demonstrate the existence of so-called "plus factors." Apex Oil, 822 F.2d at 252; see also In re Flat Glass Antitrust Litig., 385 F.3d 350, 360 (3d Cir.2004) ("[W]e have required that plaintiffs basing a claim of collusion on inferences from consciously parallel behavior show that certain `plus factors' also exist."); Fears v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911(HB), 2004 WL 594396, at *4 (Mar. 23, 2004) (stating that because "[p]arallel conduct may be equally suggestive of independent conduct," a plaintiff "must demonstrate additional circumstances"). "These plus factors include: (1) evidence of conduct that is contrary to the defendants' independent self-interest; (2) the presence or absence of a strong motive to enter into the alleged conspiracy; (3) the artificial standardization of products; and (4) a high level of inter[-]firm communications." In re Medical X-Ray Film Antitrust Litig., 946 F.Supp. 209, 218 (E.D.N.Y.1996) (citing Apex Oil, 822 F.2d at 254); see also In re Nasdaq Market-Makers Antitrust Litig., 894 F.Supp. 703, 713 (S.D.N.Y.1995).

II. Analysis

Defendants contend that (i) there is no evidence that the various FX Fee increases resulted from a conspiracy involving Amex; and (ii) Plaintiffs lack antitrust standing as to their arbitration clause conspiracy claim because they cannot demonstrate "threatened loss."

a. Price Fixing Conspiracy

i. Parallelism

As an initial matter, a jury could reasonably infer that Amex did not finalize its decision to increase its FX Fee to 2% until after the May 25 Meeting. Amex argues that its executives' testimony and the April 1999 notification to cardholders demonstrate that Amex finalized its decision prior to the May 25 Meeting. Yet there is significant evidence undercutting that assertion. For example, the only internal Amex documents in the record memorializing its decision to raise the FX Feenamely, the May 28 Outline and the June Memowere published after the May 25 Meeting. The May 28 Outline is particularly telling. At least two inferences can reasonably be drawn from the outline's statement that "NY Treasury & CSG have confirmed subsequent to the meeting that an FX increase will be implemented regardless of results from the FX competitive study." First, a jury could infer that the referenced "meeting" was *367 the May 25 Meeting at Wilmer Cutler.[5] Second, a jury could infer that Amex had originally planned to wait for the competitive pricing study to be completed (which would not occur any earlier than June) before increasing its FX Fee. The May 28 Outline also suggests that the exact level of increase had not yet been decided. (See May 28 Outline) (stating: "US CSG to advise NJ by Friday 4th June the level of increase."). The June Memo's explanation of Amex's FX Fee increase reinforces these inferences. (See June Memo (stating "I am now able to update you on the Treasury FX Competitor Rate Study and Variable FX rate initiative. . . . CCSG in the U.S. have made a decision to increase their foreign exchange mark up from 1 to 2% for all U.S. outspend effective July 1, 1999.").)
That Amex cannot pinpoint the precise date of its decision to implement an FX Fee is arresting. The record demonstrates that Amex's pricing decisions were made through a hierarchy of individuals with pricing authority. Indeed, Amex's evaluation in 1997 of the same potential FX Fee increase generated several internal memoranda explaining the concerns of various business units that were eventually communicated to Amex's CEO. It is remarkable, therefore, that Amex cannot be more precise than to say that it decided to increase its FX Fee in "early 1999." (Amex Br. at 6). The lack of internal company documentation raises suspicion. As Amex's counsel conceded, Amex cannot identify "anything more specific" than the April 1999 change-in-terms notice to establish the timing of its decision to increase its FX Fee. (Hr'g Tr. at 16-17, Aug. 19, 2010.) Accordingly, the facts support the inference that Amex finalized its FX Fee increase on May 28, 1999 or sometime thereafter.
The evidence also supports an inference that Chase did not finalize its decision to impose an FX Fee until after the May 25 Meeting. In particular, Plaintiffs identify the May 27, 1999 letter from a Chase executive authorizing MasterCard to implement an FX increase on certain debit cards, and the May 28, 1999 instruction that Chase's card processor begin charging a 2% FX Fee on its credit cards. While Amex submits contradictory testimony by an executive who "believed" Chase finalized its FX Fee plan in April 1999, a genuine dispute nevertheless exists. Moreover, Chase did not begin imposing an FX Fee until November 1999.
The parties do not dispute that First USA notified cardholders of a 2% FX Fee in February 1999 and that implementation of the fee was delayed. However, the evidence supports an inference that First USA delayed implementation in order to render its FX Fee less transparent to cardholders. There is extensive correspondence documenting First USA's disclosure concerns and it did not impose an FX Fee until March 2000.
Similarly, there is no dispute that Household planned to notify cardholders of its FX Fee in March 1999 but delayed notification and implementation until mid to late 2000. In November 2000, Household began imposing a 2% FX Fee on certain cards.
The parties also agree that Bank of America approved an FX Fee of an unspecified percentage in March 1999. However, the evidence supports an inference that Bank of America delayed implementation in order to obscure its FX Fee from *368 cardholders. There is evidence suggesting that implementation was particularly difficult for Bank of America and it did not begin imposing a 2% Fee on certain cards until January 2001.
There is also no dispute that Providian imposed a 4% FX Fee beginning in July 1998 and announced a lower 2% fee in August 1999. Nor is it disputed that Citi announced its intent to impose an FX Fee in September 1998 and implemented it on certain cards in April 1999.
The record in this case of MBNA's participation in the alleged conspiracy is sparse given that it did not notify cardholders of an FX Fee until 2001 or begin implementing the fee until 2004. However, the Court does not need to reach that issue to decide this motion.
Drawing all reasonable inferences in Plaintiffs' favor, a jury could find the following timeline of FX Fee-related events:

 ----------------------------------------------------------------------------------------------
 July 1998 Providian implements a 4% FX Fee
 ----------------------------------------------------------------------------------------------
 September 1998 Citi sends notice of a 2% FX Fee
 -----------------------------------------------------------------------------------------------
 February 1999 First USA sends notice of a 2% FX Fee
 ----------------------------------------------------------------------------------------------
 March 1999 Bank of America approves a proposal to impose an FX Fee;
 Household plans to send but ultimately delays notice of an FX
 Fee
 ----------------------------------------------------------------------------------------------
 April 1999 Amex sends notice of a 1% FX Fee increase; Citi implements a
 2% FX Fee
 ----------------------------------------------------------------------------------------------
 May 1999 Many of the alleged co-conspirators attend the May 25 Meeting
 ----------------------------------------------------------------------------------------------
 May 1999 (following the Amex finalizes its decision to increase its FX Fee; Chase finalizes
 May 25 Meeting) its decision to impose an FX Fee
 ----------------------------------------------------------------------------------------------
 August 1999 Providian reduces its FX Fee to 2%
 ----------------------------------------------------------------------------------------------
 November 1999 Chase implements a 2% FX Fee
 ----------------------------------------------------------------------------------------------
 February 2000 Bank of America sends notice of a 2% FX Fee
 ----------------------------------------------------------------------------------------------
 March 2000 First USA implements a 2% FX Fee on certain cards
 ----------------------------------------------------------------------------------------------
 November 2000 Household implements a 2% FX Fee on certain cards
 ----------------------------------------------------------------------------------------------
 January 2001 Bank of America begins imposing a 2% FX Fee on certain cards
 ----------------------------------------------------------------------------------------------

Against this timeline, a jury could reasonably infer that Amex and the Banks engaged in parallel FX Fee-related conduct in the first half of 1999. Under the circumstances, the fact that some conspirators' decisions to impose or increase their FX Fees were several months apart does not preclude the existence of a conspiracy. Corporate decisions to hide the FX Fee from cardholders and the existence of technical programming issues provide a reasonable explanation for the delay by certain Banks in implementing the fee. Accordingly, this Court finds that a jury could find parallel conduct.

ii. Plus Factors

Plaintiffs submitted substantial evidence of at least two "plus factors" showing the existence of a conspiracy involving Amex. First, a jury could reasonably infer that Amex had a strong motive to enter into a price-fixing conspiracy with its competitors. The evidence demonstrates that Amex wanted to raise its FX Fee but was constrained by the fact that its competitors had not yet begun imposing the fee and by its disinclination to be a market-leader on pricing.
Second, there were numerous inter-firm communications among the alleged conspirators in the first half of 1999. As a threshold matter, Amex's contention that *369 these communications were confined to disclosure issues and did not address specific FX Fee amounts overlooks a critical aspect of the conspiracy: prior to 1999, with the exception of Providian, the Banks had not implemented any FX Fee. Thus, the fact that the Banks discussed how to disclose an FX Fee suggests they also discussed their intent to charge one. (See Aldridge Decl. Ex. 4: Joint Expert Report of Gustavo E. Bamberger and Bradley N. Reiff dated April Dec. 22, 2004 at ¶50) (noting that the "sharing of information on current operating and future business plans is more likely to raise [antitrust] concerns") (quoting federal antitrust guidelines). More importantly, Sundheim's notes support an inference that specific FX Fee amounts were discussed at the May 25 Meeting and during one of her calls with Bergeson. See Todd v. Exxon Corp., 275 F.3d 191, 211 (2d Cir.2001) ("The Supreme Court has made clear that exchanges of current price information . . . have the greatest potential for generating anti-competitive effects.") (internal quotations omitted); In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 906 F.2d 432, 452 (9th Cir. 1990) ("[T]he evidence . . . amply supports an inference that the exchange of price information . . . was done with the purpose and effect of allowing greater coordination and stabilization of prices."); Fleischman v. Albany Med. Ctr., 728 F.Supp.2d 130, 161 (N.D.N.Y.2010) ("Most significantly, these information exchanges contained current and future . . . compensation information.").
The nature and timing of the communications also support an inference of the existence of a conspiracy involving Amex. The first half of 1999 brought a spate of FX Fee announcements and decisions by Citi, Chase, First USA, Bank of America and Amex.[6] At the same time, in-house counsel for Citi, Chase and First USA were discussing FX Fee disclosure issues, and Citi's in-house counsel was referring lawyers who had questions about disclosure issues to Greene at Wilmer Cutler. Greene then organized the May 25 Meeting,[7] co-sponsored by his client Amex, where he detailed the precise manner in which Amex camouflaged its FX Fee from cardholders. Amex has failed to offer a compelling rationale for why it would disclose such information. See Todd, 275 F.3d at 198 ("[A] horizontal price-fixing agreement may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices. Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement.") (internal citations omitted); In re High Pressure Laminates Antitrust Litig., No. 00 MDL 1368(CLB), 2006 WL 1317023, at *2 (S.D.N.Y. May 15, 2006) (finding that defendants' reasons for sharing sensitive information was a question for the jury). Then, within days of the May 25 Meeting, Amex and Chase confirmed their decisions to impose or raise their FX Fees. Under these circumstances, a jury could reasonably find "that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement" that originated in advance of, or was confirmed at, the May *370 25 Meeting. Apex Oil, 822 F.2d at 252; see In re TFT-LCD (Flat Panel) Antitrust Litig., 586 F.Supp.2d 1109, 1116 (N.D.Cal. 2008) ("Courts have held that a conspiracy to fix prices can be inferred from an invitation, followed by responsive assurances and conduct.").
Amex's argument that the discussions in advance of the May 25 Meeting did not involve Amex representatives is unconvincing. See Flat Glass, 385 F.3d at 363 ("If six firms act in parallel fashion and there is evidence that five of the firms entered into an agreement, . . . it is reasonable to infer that the sixth firm acted consistent with the other five firms' actions because it was also a party to the agreement."). Moreover, Amex's sponsorship of and attendance at the May 25 Meeting is a significant inter-firm communication in itself. And the evidence supports an inference that Amex's outside counsel was fielding calls related to the FX Fee prior to the May 25 Meeting. At a minimum, significant disputes exist as to Amex's participation which render summary judgment inappropriate. See Ethylene Propylene, 681 F.Supp.2d at 176 ("[T]here may be an innocent explanation and full defense to the plaintiffs' proof of those communications. But the fact that no document definitively proves the conspiracy's existence does not mean that the motion for summary judgment must be granted.").
Similarly, Amex is not insulated from liability merely because executives with pricing authority did not attend the May 25 Meeting. Amex cites In re Baby Food Antitrust Litigation, in which the Third Circuit held that "[e]vidence of sporadic exchanges of shop talk among field sales representatives who lack pricing authority is insufficient to survive summary judgment." 166 F.3d 112, 125 (3d Cir.1999). Yet here, senior in-house counsel attended the May 25 Meeting and engaged in discussions on a far higher plane than mere "shop talk" among low-level employees. Drawing all reasonable inferences in Plaintiffs' favor, the facts satisfy the Baby Food standard that "to survive summary judgment, there must be evidence that the exchanges of information had an impact on pricing decisions." Baby Food, 166 F.3d at 125. Indeed, within days of exchanging information at the May 25 Meeting about FX Fee amounts and disclosure methods, Amex and Chase finalized their decisions to increase their FX Fees. See Flat Glass, 385 F.3d at 369 ("The exchanges of information here . . . are qualitatively different from those in In re Baby Food, particularly when considered in the context of other evidence. First, there is evidence tending to show that the exchanges occurred at a higher level of [defendants'] structural hierarchy. Second, and more importantly, a finder of fact could reasonably infer that [defendants] used the information to implement collusive price increases; that is, the exchanges of information had an impact on pricing decisions.").
The character and timing of these interfirm communications "tend[ ] to exclude the possibility" that the adoption of the Banks FX Fees and Amex's FX Fee increase resulted from parallel yet independent reactions to the same market forces. Matsushita, 475 U.S. at 588, 106 S.Ct. 1348 (quoting Monsanto, 465 U.S. at 764, 104 S.Ct. 1464). Clearly, Amex was concerned about raising its FX fee ahead of its competitors. And that concern would have been alleviated if its competitors began imposing an FX Fee. So too, a jury could find that Citi's imposition of an FX Fee in April 1999 was not sufficient incentive for Amex to raise its FX Fee and that it wanted assurances that other competitors would act in tandem.
Moreover, Plaintiffs' conspiracy allegations must be examined holistically. *371 See High Fructose, 295 F.3d at 655 (cautioning courts to avoid the trap of "suppos[ing] that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment"); H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1012 (2d Cir. 1989) ("[A court] must accord plaintiffs the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'") (quoting Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)). Typically Amex made pricing decisions based on periodic pricing studies. But in May 1999, the latest pricing study was a work in progress not scheduled to be completed until June at the earliest. Amex jettisoned its normal pricing practices by increasing its FX Fee before the study was complete. Coupled with Amex's inability to identify an internal document recording its decision to raise its FX Fee, this evidence supports the inference that Amex was motivated by non-public pricing information obtained in advance of and/or at the May 25 Meeting.
Finally, Amex's argument that the various FX Fee announcements prior to the May 25 Meeting negate the inference that Amex and the Banks conspired is susceptible to competing views. Those announcements may have served as price beacons to competitors for the purpose of gauging their willingness to raise prices. See Petroleum Prods., 906 F.2d at 446 (noting that announcements of price "information made the market more receptive to price coordination than it otherwise would have been"). Indeed, Citi's FX Fee notice to cardholders was the genesis of the communications among various in-house counsel regarding FX Fee disclosure. Alternatively, those announcements may have served as confirmation that Amex and the Banks had already agreed to raise and/or impose FX Fees. See Wilhelmina, 2004 WL 594396, at *8 ("While it is possible that [defendant] simply took the lead in raising its commissions, with the blind hope that other members would follow, it is far more reasonable to assume that [defendant] sought some guarantee that the other defendants would acquiesce, to ensure that its clients would not segregate against them."). Thus, genuine disputes abound.

iii. "Economic Sense"

The remaining question is whether it makes "economic sense" for Amex to conspire with the Banks to fix FX Fees but ultimately charge a 1% lower FX Fee than that charged by the Banks. Matsushita, 475 U.S. at 587, 106 S.Ct. 1348. This Court finds that it does.
This is not a case in which "plaintiffs' theory of . . . pricing made no practical sense [and] was speculative. . . ." Eastman Kodak, 504 U.S. at 468, 112 S.Ct. 2072. The "economic sense" standard was articulated in Matsushita, which involved the implausible theory that "a group of Japanese [electronics manufacturers] were engaging in a 20-year conspiracy to price below cost in the United States in the hope of expanding their market share sometime in the future." Eastman Kodak, 504 U.S. at 468-69, 112 S.Ct. 2072 (summarizing Matsushita). In contrast, this case involves a "garden-variety price-fixing conspiracy," albeit with a twist. High Fructose, 295 F.3d at 661.
In early 1999, while Amex, Visa and MasterCard were each charging a 1% FX Fee, most of the Banks had not yet adopted their own fee. Thus, if Amex had raised its FX Fee to 2% while the Banks imposed no fee, Amex cardholders would have been paying the highest FX Fees in the market. On the other hand, if the *372 Banks began imposing an FX Fee of at least 1%, then Amex cardholders would have been paying an FX Fee less than, or equal to, the aggregate fee paid by Visa and MasterCard cardholders (i.e., 1% to Visa and MasterCard and a 1% or greater fee to the Banks). Thus, Amex only needed assurances that the Banks would charge at least a 1% FX Fee in order to avoid leading the market. Once the Banks began charging an FX Fee, Amex was free to raise its own fee by 1%. Based on the record, a jury could infer that Amex and the Banks assented to exactly that agreement: that Amex would raise its FX Fee by 1% and the Banks would adopt a fee of at least 1%. The fact that the Banks planned to charge a 2% FX Fee does not brand the price-fixing conspiracy "economically senseless" since Amex's willingness to increase its FX Fee was not contingent on the precise percentage of the Banks' fee. Rather, it required only that the Banks begin charging one.
Nor is the agreement necessarily "senseless" from the Banks' viewpoint. Amex is uniquely situated in the credit card market as both a card issuer and a network operator. Consequently, it is plausible that although Amex viewed the Banks as its primary competitors with regard to FX Fees, the Banks may have been more concerned with competition among themselves. They may not have been troubled by Amex's 1% FX Fee increase provided that most of the Banks charged an identical fee. These are questions for trial.
Accordingly, Amex's motion for summary judgment with respect to Plaintiffs' price-fixing claim is denied.

b. Arbitration Clauses

Amex argues that Plaintiffs lack antitrust standing for their arbitration clause conspiracy claim because they are not Amex cardholders yet seek removal of the mandatory arbitration clauses from Amex's cardholder agreements. The Clayton Act "permit[s] private citizens to sue under the federal antitrust laws" as long as they "demonstrate antitrust standing." Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 290 (2d Cir.2006). This requires a private litigant to "prove `threatened loss or damage' to his own interests in order to obtain relief." California v. Am. Stores Co., 495 U.S. 271, 296, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990) (quoting 15 U.S.C. § 26).
This Court addressed nearly the identical issue in In re Currency Conversion Fee Antitrust Fee Litig., No. 05 Civ. 5116, 2009 WL 151168 (S.D.N.Y. Jan. 21, 2009) ("Bank of America Decision"), where Plaintiffs brought their arbitration clause conspiracy claim against the Banks. Specifically, this Court examined Ross v. Bank of America, 524 F.3d 217, 224 (2d Cir. 2008), in which the Court of Appeals held that allegations of "reduction in choice and diminished quality of credit services" satisfied the standard for pleading an Article III injury. Ross, 524 F.3d at 224. In the Bank of America Decision, this Court held that because "Article III injury in fact as determined by the Court of Appeals appears coextensive with antitrust injury in fact," Plaintiffs also adequately pled an antitrust injury. 2009 WL 151168, at *4.
While this issue now arises on summary judgment, this Court finds its Bank of America Decision instructive. Antitrust standing requires proof of an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts *373 made possible by the violation because the antitrust laws were enacted for the protection of competition, not competitors.'" Paycom, 467 F.3d at 290 (quotations omitted). While Amex is differently situated in that Plaintiffs are not Amex cardholders, they nevertheless suffered reduced choice in the marketplace as a result of Amex's alleged collusion with the Banks. In other words, a jury could find that Amex's conduct caused injury to competition in the credit card market.
Moreover, Plaintiffs are not deprived of antitrust standing merely because some of the alleged co-conspirators have settled and agreed to remove their arbitration clauses for three and a half years. If that were true, Plaintiffs would lack standing to pursue their claims against the remaining defendants in Ross v. Bank of America. Such a result would be absurd. This Court explicitly left open the possibility that Plaintiffs' claims in Ross v. Bank of America would be consolidated with their claims in this action. See In re Currency Conversion Fee Antitrust Litig., 2009 WL 1834351, at *1-2 (S.D.N.Y. June 18, 2009). Accordingly, Amex's motion for summary judgment for lack of antitrust standing is denied.

CONCLUSION
For the foregoing reasons, Defendants American Express Company's, American Express Travel Related Services' and American Express Centurion Bank's motion for summary judgment is denied. The Clerk of the Court is directed to terminate the motions pending at Docket Nos. 154 and 155.
SO ORDERED.
NOTES
[1] Familiarity with this Court's prior Memoranda and Orders and the opinions of the Court of Appeals is presumed. See In re Currency Conversion Fee Antitrust Litig., 264 F.R.D. 100 (S.D.N.Y.2010); In re Currency Conversion Fee Antitrust Litig., 263 F.R.D. 110 (S.D.N.Y.2009); Ross v. Am. Express Co., 547 F.3d 137 (2d Cir.2008); Ross v. Am. Express Co., 478 F.3d 96 (2d Cir.2007); Ross v. Am. Express Co., No. 04 Civ. 5723, 2006 WL 2707393 (S.D.N.Y. Sept. 21, 2006); Ross v. Am. Express Co., No. 04 Civ. 5723, 2005 WL 2364969 (S.D.N.Y. Sept. 27, 2005).
[2] While Sundheim did not expressly mention the TILA, that statute was implemented by Regulation Z. See 12 CFR § 226 et seq.
[3] Amex also cites a May 9, 1999 Los Angeles Times article stating that Amex was not having second thoughts about implementing an FX Fee increase. (Chesler Decl. Ex. B.) Even if this statement could withstand Plaintiffs' hearsay objections (see Letter from M. Davidoff to the Court dated Sept. 8, 2010 at 2), its probative value is minimal. Amex's public statements committing to the increase do not demonstrate any lack of participation in the conspiracy.
[4] While Amex also cites a report by expert Bruce Owen, that report relies on the same testimony by DiSimone. (Grayer Decl. Ex. E: Expert Report of Bruce M. Owen dated Feb. 14, 2005 at 26.)
[5] This document could also be a written summary of what occurred at the May 28 meeting, suggesting that the confirmation of the FX Fee increase could have been received after that meeting. In either case, the document supports the inference that Amex did not finalize its decision until late May 1999.
[6] That there is no direct evidence of certain of the Banks' participation in these discussions does not negate an inference that a conspiracy existed among them. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 363 (3d Cir. 2004).
[7] The May 25 Meeting would have required planning in advance during the same months in which in-house counsel for the Banks and Greene were discussing disclosure issues.