**Zoltan GUTTMAN, Petitioner,**

v.

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

**Docket No. 98–4178**

United States Court of Appeals, Second Circuit.

Argued: Aug. 10, 1998

Decided: Nov. 16, 1999

Barry A. Bohrer, Morvillo, Abramowitz, Grand, Iason, Silberberg, P.C., New York, N.Y. (Joshua H. Reisman, of counsel), for Petitioner.

J. Douglas Richards, Deputy General Counsel of the Commodity Futures Trading Commission, Washington, DC (Daniel R. Waldman, General Counsel; Merry A. Lymn, Assistant General Counsel; C. Maria Dill Godel; and Beth G. Pacella, of counsel), for Respondent.

Martin I. Kaminsky, Pollack & Kaminsky, New York, NY (W. Hans Kobelt, of counsel), for Amicus Curiae New York Mercantile Exchange.

Before: CALABRESI, CABRANES, and STRAUB, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

Zoltan Guttman petitions for review of an order of the Commodity Futures Trading Commission ("the Commission" or "CFTC") that found Guttman vicariously liable for a series of noncompetitive options transactions effected by his partner and that imposed various sanctions on him, including a permanent trading ban. *See In re Glass*, No. 93–4, 1998 WL 205134 (C.F.T.C. Apr. 27, 1998). We hold that the weight of the evidence supports the Com-

mission's findings and we therefore deny the petition for review.

## I.

This petition for review arises from an administrative proceeding brought by the Enforcement Division ("Division") of the Commission against Zoltan Guttman, Harold Magid, Gary Glass, and Gerald, Inc. ("Gerald"). Guttman is the sole party to this appeal. The Commission's seven-count complaint charged Guttman *et al.* with multiple violations of the Commodities Exchange Act ("CEA") and Commission regulations arising out of trading activities in the "sugar pit" of the Coffee, Sugar, and Cocoa Exchange ("CSCE").[1] We set forth below the facts as presented before the CFTC's Administrative Law Judge ("ALJ").

Beginning in June 1987, Guttman and Magid opened several tenants-in-common accounts at Gerald, a futures commission merchant.[2] Magid and Guttman each owned a fifty-percent interest in the accounts and equally split the profits, losses, and expenses associated with such ownership. In early 1988, Guttman and Magid also formed a corporation, called Harley Futures, Inc., to serve as the administrative and paying agent for their joint accounts.

Magid, who served as secretary for Harley Futures, was responsible for the day-to-day management and trading of the joint accounts—that is, he supervised other traders as well as personally executed many of the trades on the floor of the CSCE. Guttman served as president of Harley Futures, and was responsible for maintaining the company's books and records, filing regulatory forms, and ar-

---

1. A pit is a location on a commodities exchange trading floor where the futures of a particular commodity (here sugar) are traded. *See* David L. Scott, Wall Street Words: An Essential A to Z Guide for Today's Investor 279 (1997).

2. A futures commission merchant, as defined by section 1a(12) of the CEA, 7 U.S.C. § 1a(12), is a person or entity that:

   (A) is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market; and (B) in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

ranging financing for the accounts. The parties dispute the degree of Guttman's involvement in the trading of the accounts; Guttman testified before the ALJ that Magid had handled all of the trading on his own (with two very minor exceptions), while Magid testified that he had stayed in constant contact with Guttman and that Guttman had helped manage the accounts.

Magid's basic trading strategy was to establish and maintain "long" options positions. A "long" option is a market position that obligates the holder to buy and take delivery of a specified quantity of a commodity at a specific price within a specified period of time, regardless of the market price of that commodity. *See* CFTC Glossary: A Layman's Guide to the Language of the Futures Industry 22, 20 (1997) ("CFTC Glossary"). This trading strategy required extensive financing. After running through a $2 million line of credit from one commodities broker, Guttman and Magid obtained an additional $3 million in financing from Gerald. By early 1989, however, the Guttman/Magid joint accounts were in "debit equity" [3] status— meaning that, although Gerald continued to lend funds to cover the accounts vis-à-vis other traders and the CSCE, the accounts were regularly running negative balances (at one time as high as $2 million). In February or March 1989, Gerald's chief operating officer, Julian Raber, informed Guttman and Magid that while Gerald would continue to cover the balances in the accounts during any given month, it would not be able to provide financing from one month to the next. Thus, Guttman and Magid would either have to produce revenue for the accounts or liquidate their long positions.

After determining that additional direct financing was not a realistic option, Guttman, Magid, and Raber decided that short-term financing could be generated on the floor through a series of "box trades." A "box trade" is an option position in which the holder establishes a long call (option to buy) and a short put (obligation to sell) at one strike price and a short call and a long put at another strike price, all of which are in the same contract month, in the same commodity. CFTC Glossary at 4. Once the end-month debit equity had been taken care of, the trades would be reversed within the first few days of the next month. After Gary Glass was suggested as someone who might be interested in acting as the counterparty to such trades, Glass was contacted and agreed to participate in the transactions.[4] Subsequently, Magid and Glass decided to use "strangles" (combinations of puts and calls that involve fewer commissions than "box trades," but are somewhat riskier because they are purchased and sold at different strike prices) instead of "box trades." *See* CFTC Glossary at 29. *Compare Playan v. Refco, Inc.*, No. 98–R006, 1999 WL 261591, at *2 (C.F.T.C. Apr.30, 1999) ("With [strangles], the trader is speculating on the volatility (or lack thereof) of the price of the underlying asset."), *with Glass*, 1998 WL 205134, at *25 n. 24 (describing boxes as "riskless").

On six occasions during the next seven months, Magid and Glass executed the following combination of trades: On the last trading day of the month, Magid would sell Glass a strangle in an amount and at prices that would generate just enough cash to put the Guttman/Magid accounts in the black. On the first trading day of the next month, Magid would buy back from Glass the same strangle (*i.e.*, the same combination of puts and calls) at slightly

---

3. Equity is "[t]he residual dollar value of a futures, option, or leverage trading account, assuming it was liquidated at current prices." CFTC Glossary at 13. Debit equity status, accordingly, refers to a negative residual dollar value.

4. It is unclear who actually contacted Glass; Magid testified that it was Guttman, but Guttman and Glass testified before the ALJ that they never spoke to each other about the transactions.

higher prices, thereby covering Glass's commission costs and providing him with a small profit. Thus, at the end of each month the accounts would be balanced—and no month-to-month financing would be required—but on the very next trading day, the accounts would be returned to debit equity status.

No offsetting trades were executed after October 1989 because Guttman and Magid obtained direct financing from another brokerage house. In June 1990, however, Guttman and Magid suffered a major loss and were forced to liquidate their accounts. Magid later sued Guttman in state court, seeking several million dollars in damages in connection with that loss.

In February 1993, the Division filed a complaint charging Magid and Glass with engaging in prearranged, noncompetitive "wash" trades and with reporting a non-bona fide price on those trades to the CSCE in violation of section 4c(a)(A) and (B) of the CEA, 7 U.S.C. § 6c(a)(A) and (B), and various Commission regulations.[5] The complaint also charged that Guttman was vicariously liable for Magid's violations because Magid was acting as his agent under section 2(a)(1)(A) of the CEA, 7 U.S.C. § 4,[6] and because he was a "controlling person" of Magid under section 13(b) of the CEA, 7 U.S.C. § 13c(b).[7] Magid ultimately settled with the Division and

agreed to cooperate in the case against Guttman and Glass.

From October 24 to October 27, 1995, the ALJ held an evidentiary hearing on the merits of the charges against Guttman and Glass. At the hearing, Magid testified for the Division. On cross-examination, Guttman's counsel attempted several lines of questioning aimed at impeaching Magid's credibility. Specifically, counsel sought to elicit testimony concerning Magid's civil suit against Guttman, Magid's settlement and cooperation agreement with the Division, and prior, allegedly inconsistent, statements Magid had made regarding Guttman's involvement in the illegal trades. The ALJ, however, disallowed this type of questioning as falling beyond the scope of the direct examination, and instead instructed Guttman's counsel to (1) limit his cross-examination to matters raised during the Division's direct examination and, (2) if he wished to inquire about other matters, to recall Magid as part of Guttman's case-in-chief. The ALJ repeated this instruction several times during the attempted cross-examination of Magid and eventually, when counsel persisted in asking impeachment questions unrelated to the subject matter of the direct examination, cut off the cross-examination and dismissed the witness. Gutt-

---

5. Section 4c(a)(A) and (B), 7 U.S.C. § 6c(a)(A) and (B), provides in relevant part:

It shall be unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity . . .
  (A) if such transaction is, is of the character of, or is commonly known to the trade as, a "wash sale," "cross trade," or "accommodation trade," or is a fictitious sale; or
  (B) if such transaction is used to cause any price to be reported, registered, or recorded which is not a true and bona fide price.

6. Section 2(a)(1)(A), 7 U.S.C. § 4, provides:

[T]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corpo-

ration, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

7. Section 13(b), 7 U.S.C. § 13c(b), provides:

Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

man's counsel elected not to recall Magid during his case-in-chief.

On September 11, 1996, the ALJ ruled that Glass (and Magid) had engaged in the alleged trading violations. The ALJ found also that Guttman had not "controlled" Magid, but that Guttman was nevertheless vicariously liable for Magid's violations because Magid had been acting as Guttman's agent in executing the illegal trades. The ALJ ordered Glass to cease and desist from violating the CEA and imposed a permanent trading ban and a $150,000 civil monetary penalty against him. The ALJ imposed the following sanctions on Guttman: a five-year trading ban, a $500,000 civil penalty, revocation of his registration, and a cease-and-desist order.

Guttman and Glass appealed the ALJ's liability decision and, additionally, the sanctions imposed on them; the Division cross-appealed the ALJ's finding that Guttman was not liable as a "controlling person" of Magid. On April 27, 1998, the Commission issued a final opinion and order, affirming in part, reversing in part, and modifying the ALJ's decision. Specifically, the Commission affirmed the ALJ's determination that Guttman was vicariously liable because Magid had been acting as his agent, and reversed the ALJ's ruling that Guttman had not "controlled" Magid. The Commission also *sua sponte* modified the sanctions imposed on Guttman, increasing the five-year trading ban ordered by the ALJ to a permanent one, pursuant to a policy of reviewing sanctions *de novo* adopted by the Commission a few months after the ALJ's decision and three days before Guttman filed his appeal. *See In re Grossfeld,* No. 89–23, 1996 WL 709219, at *11 (C.F.T.C. Dec. 10, 1996) ("[I]n this case and in the future we will determine sanctions de novo rather than defer to the assessment of Commission ALJs."), *aff'd on other grounds,* 137 F.3d 1300 (11th Cir.1998). This timely petition for review followed.

## II.

Guttman's petition raises three separate challenges to the Commission's final order. First, Guttman contends that the Commission erred in holding that the ALJ's limitation of the cross-examination of Magid did not deny Guttman his due process right to confront the evidence against him. Second, he maintains that the Commission erred in finding him vicariously liable, both as a principal and as a controlling person, for Magid's trading violations. Finally, he claims that the Commission's decision to enhance the sanctions against him constituted an abuse of discretion and a violation of due process. We address each of these challenges in turn.

### A. Limitations on the Cross–Examination of Division Witness Magid

■ It is well-established that triers of fact are afforded wide discretion to impose limits on the cross-examination of witnesses, *see, e.g., Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *United States v. Rahman,* 189 F.3d 88, 132 (2d Cir.1999), and that this discretion includes the power to limit cross-examination to the scope of the testimony on direct examination. *See Cities of Bethany v. Federal Energy Regulatory Comm'n,* 727 F.2d 1131, 1145 (D.C.Cir.1984).

■ In the instant case, the ALJ directed the attorneys to limit cross-examination of all witnesses—not just Magid—to the scope of the direct testimony, and specified that any testimony not squarely related to the subject matter of the direct examination should be elicited by calling (or recalling) the witness during one's own case-in-chief. Guttman contends that this limitation, particularly as it affected his cross-examination of Magid, deprived him of his right to confront the evidence against him, and thereby denied him due process of law. It is undisputed that denial of the opportunity to cross-examine a witness whose testimony forms the basis for adverse findings can constitute

grounds for reversal. *See Demenech v. Secretary of Dept. of HHS,* 913 F.2d 882, 885 (11th Cir.1990) (reversing for failure to permit cross-examination regarding disputed, post-hearing, evidence on which ALJ relied); *North Am. Coal Co. v. Miller,* 870 F.2d 948, 951 (3d Cir.1989) (same). However, nothing in the record before us indicates that Guttman was denied the opportunity to cross-examine Magid. Indeed, what Guttman characterizes as deprivation of his right to confront witnesses can more accurately be described as regulation of the *sequencing* of testimony. Guttman's attorney may have been prevented from inquiring into new, potentially impeaching, subjects during the cross-examination, but he was not prevented altogether from pursuing such matters; rather, he was instructed to do so at a later point in the hearing, by calling Magid as a witness in his own case. This may or may not be the conventional sequence of witness testimony, but it is not inherently defective or wrong as a matter of law, so long as the judge affords a full opportunity during the proceedings to examine a witness's credibility. Nor is this sort of sequencing necessarily prejudicial—particularly in a bench trial, where there is no jury to be won over by the drama of undermining a witness's credibility immediately on the heels of his direct testimony.

In sum, we conclude that the Commission properly found that the ALJ acted within his discretion in limiting the cross-examination of Magid to the scope of his direct testimony.

## B. Guttman's Vicarious Liability

Guttman does not dispute that his partner, Magid, engaged in noncompetitive trades in violation of the CEA; rather, Guttman challenges the CFTC's determination that he is vicariously liable for Magid's trading misdeeds. That determination rested on two distinct findings: (1) that Magid was acting as Guttman's agent when executing the illegal trades; and (2) that Guttman was a "controlling person" of Magid. Guttman contests both of these findings.

### 1. Principal–Agent Liability

In the commodity futures industry, the liability of a principal for the acts or conduct of his agent is governed by section 2(a)(1)(A) of the CEA, 7 U.S.C. § 4. Liability may be imposed under section 2(a)(1)(A) if the CFTC shows that (1) Magid was acting as Guttman's agent when he executed the unlawful trades, and (2) Magid's actions were within the scope of his employment or office. *See In re Big Red Commodity Corp.,* No. 80–21, 1985 WL 56291, at *10 (C.F.T.C. June 7, 1985). Guttman need not actually have participated in Magid's wrongful conduct or have controlled Magid's behavior; for the purpose of imposing liability under section 2(a)(1)(A), it is enough if Magid was "acting for" Guttman in executing the illegal trades. *See, e.g., Rosenthal & Co. v. CFTC,* 802 F.2d 963, 966 (7th Cir.1986); *In re Glass* No. 93–4, 1996 WL 518121, at *8–*9 & n. 14 (C.F.T.C. Sept. 11, 1996). The Commission found that "Magid's [trading] violations resulted from a direction from Guttman to implement a financing strategy that Guttman knew would involve unlawful trading." It also found that trading options was "Magid's principal partnership responsibility" and, accordingly, that the illegal trades in question were within the scope of Magid's employment. These liability findings are conclusive if supported by the weight, or preponderance, of the evidence. *See* 7 U.S.C. § 9 ("[T]he findings of the Commission as to the facts, if supported by the weight of evidence, shall ... be conclusive."); *Haltmier v. CFTC,* 554 F.2d 556, 560 (2d Cir.1977); *see also Reddy v. CFTC,* 191 F.3d 109, 117 (2d Cir.1999); *Dohmen–Ramirez v. CFTC,* 837 F.2d 847, 856 (9th Cir.1988). In reviewing the Commission's findings, however, we will not "mechanically reweigh[ ] the evidence to ascertain in which direction it preponderates." *Haltmier,* 554 F.2d at 560 (internal quotation marks omitted).

Rather, we "review the record with the purpose of determining whether the finder of fact was justified, *i.e.*, acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported [its] findings." *Id.* (internal quotation marks omitted).

Here, the Commission's finding that Magid was acting as Guttman's agent is amply supported by the record. Guttman delegated responsibility for trading the account to Magid. Moreover, Guttman concedes that, once the debit equity problem emerged, he and Magid agreed that Magid would seek to resolve the problem by executing end-of-the-month box trades that would temporarily eliminate the end-month debit equity. Finally, there is substantial evidence that Guttman instructed and "cajoled" Magid at month's end to ensure that the illegal trades took place. In light of this evidence, we conclude that the Commission was justified in holding Guttman liable under section 2(a)(1)(A) for Magid's trading violations.

Guttman's principal objection to the Commission's holding that he was liable for Magid's actions is that a tenancy-in-common—such as Guttman and Magid's joint ownership of the trading accounts— does not establish a principal-agent relationship. While this may be true as a general proposition, *see, e.g., Masick v. City of Schenectady,* 164 A.D.2d 488, 564 N.Y.S.2d 569, 570 (3d Dep't 1991) ("[J]oint ownership of property as tenants in common does not create . . . an agency relationship."); 24 *N.Y. Jur.2d Cotenancy and Partition* § 4 (1982), the CFTC's showing of an agency relationship in the instant case did not rest on Guttman's and Magid's status as tenants in common. Rather, both the ALJ and the Commission based their conclusions on factual findings that Guttman actively participated in Magid's unlawful trading—that is, that Guttman and Magid agreed that Magid would eliminate their deficits and solve their month-to-month financing problem through noncompetitive options trades, that Guttman authorized Magid to act on his behalf, and that Guttman regularly reminded Magid to deal with the deficits at the end of each month. These factual findings, not Guttman's tenancy-in-common with Magid, formed the basis for the conclusion that Magid was "acting for" Guttman when he executed the offending trades.

### 2. *"Controlling Person" Liability*

Because the principal-agent and controlling person theories of liability are independently sufficient grounds for assessing vicarious liability, *compare* 7 U.S.C. § 4 (liability of a principal for acts of his agent), *with* 7 U.S.C. § 13c(b) (liability of a controlling person for violations of the controlled), and because we agree with the Commission's determination that Guttman is liable as Magid's principal for the illegal trades at issue, we need not here consider the question of whether Guttman also can be held liable for the unlawful trades as a controlling person of Magid.

### C. The Permanent Trading Ban

Three days before Guttman filed his appeal from the ALJ's decision, the Commission decided *Grossfeld,* 1996 WL 709219, in which it announced a policy that it would exercise its own independent, or *de novo,* judgment in assessing sanctions on appeal. *See id.* at *11. Until then, the CFTC's practice was not to "second-guess the ALJ's choice of sanctions" or to "substitute [its independent] judgment in the absence of an abuse of discretion." *In re Gordon,* No. 90–19, 1995 WL 94952, at *3 (C.F.T.C. Mar. 6, 1995). Guttman does not dispute the Commission's power to adopt *de novo* review of sanctions imposed by the ALJ; rather, he contends that he had a due process right to notice that the Commission was contemplating a sanction en-

hancement and to an opportunity to be heard on the issue.[8]

■ We have recently considered and rejected a similar due process argument. *See Reddy*, 191 F.3d at 128–29 (upholding the Commission's *sua sponte* increase of sanctions in an appeal perfected *before* the decision in *Grossfeld*, despite the petitioners' argument that the unexpected increase deprived them of their due process right to defend their position on appeal). For the reasons stated in *Reddy*, we hold that the Commission's decision in the instant case, to increase the sanctions imposed by the ALJ, did not violate Guttman's due process rights.

■ In the alternative, Guttman argues that the Commission's choice of sanctions was so draconian as to constitute an abuse of discretion. He contends that the imposition of a permanent trading ban, in particular, was unduly harsh—both in relation to the sanctions imposed in comparable cases and in light of the fact that he was only vicariously, rather than directly, responsible for the trading violations. There is, however, no legal requirement that administrative sanctions be uniform across assertedly similar or comparable cases, *see FCC v. WOKO, Inc.*, 329 U.S. 223, 227–28, 67 S.Ct. 213, 91 L.Ed. 204 (1946); *cf. Grossfeld*, 1996 WL 709219, at *12 (noting that effective deterrence may be undermined by undue focus on penalties imposed in other cases), so long as the sanctions imposed fall within the range specified by Congress—as the sanctions in question here clearly do. *See* 7 U.S.C. § 9.[9] Nor is there any legal authority for the proposition that where vicarious liabili-

ty is imposed in circumstances like those in the instant case, less severe penalties than would follow from direct liability are warranted. Thus, although the permanent trading ban and other sanctions undoubtedly constitute serious punishment, Guttman has not shown that, in the circumstances of this case, these sanctions are so unwarranted or severe as to rise to the level of an abuse of the CFTC's discretion.

### CONCLUSION

For the reasons stated above, the petition for review is denied.

---

8. In particular, Guttman argues that he should have been given an opportunity to explain a 1976 securities violation which the ALJ ignored, but on which the Commission partly relied in increasing the sanctions against him.

9. Section 6(c) of the CEA, 7 U.S.C. § 9, provides in relevant part:
    Upon evidence received, the Commission may (1) prohibit [a trading offender] from trading on or subject to the rules of any

contract market and require all contract markets to refuse such person all trading privileges thereon for such period as may be specified in the order, (2) if such person is registered with the Commission in any capacity, suspend, for a period not to exceed six months, or revoke, the registration of such person, (3) assess such person a civil penalty of not more than the higher of $100,000 or triple the monetary gain to such person for each such violation.