In re: **PLATINUM AND PALLADIUM COMMODITIES LITIGATION.**

**This Document Relates to: All Actions.**

**No. 10 Civ. 3617 (WHP).**

United States District Court, S.D. New York.

Sept. 13, 2011.

Christopher Lovell, Esq., Lovell Stewart Halebian Jacobson LLP, Christopher J. Gray, Esq., Law Office of Christopher J. Gray, P.C., New York, NY, John A. Lowther, Esq., Doyle Lowther LLP, San Diego, CA, for Plaintiffs.

David M. Zensky, Esq., Akin Gump Strauss Hauer & Feld, New York, NY, for Moore Defendants.

Jennifer L. Rochon, Esq., Jade A. Burns, Esq., Kramer Levin Naftalis & Frankel LLP, New York, NY, for Christopher Pia.

Therese M. Doherty, Esq., Herrick, Feinstein LLP, New York, NY, for MF Global Inc.

## MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

Plaintiffs Gregory Galan, Lawrence Waxman, Richard White, Russell W. Andrews, Frederick W. DeVito, Mary T. DeVito, David W. DeVito, and F.W. DeVito, Inc. Retirement Plan Trust bring this putative class action against Defendants Moore Capital Management, LP ("Moore Capital"), Moore Capital Management, LLC ("Moore LLC"), Moore Capital Advisors, LLC ("Moore Capital Advisors"), Moore Advisors, Ltd. ("Moore Advisors," and together with Moore Capital Advisors, the "Advisors"), Moore Macro Fund, LP ("Moore Macro Fund"), Moore Global Fixed Income Master Fund, LP ("Moore Global Fund," together with Moore Macro Fund, the "Funds," and with the other Moore entities, the "Moore Defendants"), MF Global, Inc. ("MF Global"), and Christopher Pia ("Pia"). The Consolidated Class Action Complaint dated September 30, 2010 (the "Complaint") alleges violations of the Commodity Exchange Act ("CEA"), the Sherman Act, and the Racketeer Influenced and Corrupt Organizations Act ("RICO") arising from a scheme to manipulate the prices of platinum and palladium futures contracts from October 25, 2007 to June 6, 2008 (the "Class Period"). Defendants move to strike certain allegations in the Complaint and to dismiss the action for failure to state a claim. For the following reasons, Defendants' motion to strike is granted in part and denied in part, and their motion to dismiss is granted.

## BACKGROUND

### I. The Commodities Futures Trading Commission ("CFTC") Proceeding

On April 29, 2010, the CFTC issued an order (the "CFTC Order") instituting an administrative proceeding against Moore Capital and the Advisors arising out of their attempted manipulation of platinum and palladium futures contracts. (Compl. Ex A: Order Instituting Proceedings Pursuant to Sections 6(c), 6(d) and 8a of the Commodity Exchange Act and Making Findings and Imposing Remedial Sanctions at 1, 12.) The CFTC Order was issued after Moore Capital and the Advisors "submitted an Offer of Settlement, which the [CFTC] ... accept[ed]." (CFTC Order at 1.)

The CFTC Order included findings of fact and imposed sanctions on the Moore Capital and the Advisors, including a $25 million fine. (CFTC Order at 1, 7.) Spe-

cifically, the CFTC found that between November 2007 and May 2008 a former portfolio manager for Moore Capital—identified in the Complaint as Pia—"engaged in a trading strategy in an attempt to manipulate upward the settlement prices of the palladium and platinum futures contracts." (CFTC Order at 2, 3.) This strategy, known as "banging the close," involved placing market-on-close buy orders through a futures commission merchant—identified in the Complaint as MF Global—in the last ten seconds of the closing period for each commodity. (CFTC Order at 2.) The orders "were relatively large" for the "illiquid palladium and platinum markets" and typically "constituted a large percentage of volume of trading on the close." (CFTC Order at 3.)

Following the filing of this action, the CFTC instituted proceedings against Pia arising out of the same conduct. (Attachment to Letter from C. Lovell to the Court dated July 27, 2011). Those proceedings also resulted in a consent order that recited findings of fact and imposed sanctions on Pia, including a $1 million fine.

## II. *The Parties*

Plaintiffs purchased and sold platinum and palladium futures contracts—as well as the commodities themselves—during the Class Period. (Compl. ¶¶ 18–26.)

Moore Capital is a Delaware limited partnership headquartered in New York. (Compl. ¶ 27.) It is a "multi-strategy investment firm" that manages various investment funds. (Compl. ¶ 27.) Moore Capital is the successor-in-interest to Moore LLC.

Pia was a portfolio manager at Moore Capital and the head of the "execution desk" operated by the Moore Defendants. (Compl. ¶ 31.) [1]

Moore Capital Advisors is a Delaware limited liability company headquartered in New York, and a registered commodity pool operator and commodity trading advisor. (Compl. ¶ 29.) Moore Advisors is a Bahamian company and also a registered commodity pool operator. (Compl. ¶ 30.)

The Funds are investment funds organized under the securities laws of the Bahamas. (Compl. ¶¶ 32–33.) The Complaint's allegations regarding the relationship between the Funds and the Advisors are confusing and contradictory. On the one hand, the Complaint alleges that the Funds "made, paid for[,] and financed [Defendants'] manipulative trades" through their agents and the Advisors, suggesting control over the scheme by the Funds. (Compl. ¶¶ 32–33.) However, the Complaint also states that the Funds were "at all relevant times controlled and managed by the Moore Defendants" and that the Advisors were co-general partners of the Funds. (Compl. ¶¶ 29–30, 33, 127.) Obfuscating matters further (and as discussed in detail below), the Complaint defines the "Moore Defendants" to include the Funds themselves. (Compl. ¶ 33.)

MF Global is a financial derivatives broker headquartered in New York. (Compl. ¶ 34.) MF Global acted as the futures commission merchant for the Moore Defendants. (Compl. ¶ 34(a).) A futures commission merchant is "[a]n individual or firm that executes orders to buy and sell futures or futures options." *Black's Law Dictionary* 746 (9th ed. 2009). As the Moore Defendants' futures commission merchant, MF Global "carried the Moore Defendants' accounts, accepted and en-

---

**1.** The Complaint is unclear about whether Pia worked for Moore Capital, Moore LLC, or both. (*See* Compl. ¶¶ 28, 31.)

tered their manipulative trades, and otherwise assisted the Moore Defendants." (Compl. ¶ 34(c).)

## DISCUSSION

### I. Motion to Strike

■ Defendants move to strike all references to the CFTC Order from the Complaint on the grounds that they are immaterial to Plaintiffs' claims. Fed.R.Civ.P. 12(f) permits a court to "strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." "[M]otions to strike are [generally] viewed with disfavor and infrequently granted." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y.2003) (Pollack, J.). A motion to strike "will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir.1976). "Resolution of a Rule 12(f) motion is left to the district court's discretion." *Equal Employment Opportunity Comm'n v. Bay Ridge Toyota, Inc.*, 327 F.Supp.2d 167, 170 (E.D.N.Y. 2004).

In seeking to strike the allegations based on the CFTC Order, Defendants rely primarily on *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir.1976). There, the Court of Appeals held that references to a complaint in a separate action against the defendant by the Securities and Exchange Commission ("SEC") were properly stricken from the plaintiff's complaint. The Court of Appeals observed that the SEC's complaint ultimately resulted in a consent judgment "between a federal agency and a private corporation [that] is not the [product] of an actual adjudication of ... the [underlying] issues. Consequently, it cannot be used as evidence in subsequent litigation between that corporation and another party." *Lip-*

*sky*, 551 F.2d at 893. The Court of Appeals then explained that "[s]ince it is clear that the SEC[ ] consent judgment, itself, can have no possible bearing on the [plaintiff's] action, the SEC complaint which preceded the consent judgment is also immaterial, for the purposes of Rule 12(f)." *Lipsky*, 551 F.2d at 893–94. Accordingly, the Court of Appeals "h[e]ld that neither a complaint nor references to a complaint [that] results in a consent judgment may properly be cited in the pleadings...." *Lipsky*, 551 F.2d at 893.

As courts in this Circuit have found repeatedly, *Lipsky* teaches "that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f)...." *Merrill Lynch*, 218 F.R.D. at 78; *see Gotlin v. Lederman*, 367 F.Supp.2d 349, 363 (E.D.N.Y.2005) (Glasser, J.) ("[C]ourts hold that references in pleadings to agreements with state or federal agencies may properly be stricken on a Rule 12(f) motion."); *Ledford v. Rapid–American Corp.*, No. 86 Civ. 9116(JFK), 1988 WL 3428, at *1 (S.D.N.Y. Jan. 8, 1988) ("[R]eferences in a complaint to proceedings which do not adjudicate underlying issues may be stricken."); *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 336 (Bankr.S.D.N.Y.1999) ("The Second Circuit has clearly held that consent judgments ... are not the result of actual adjudications on the merits and therefore cannot be used as evidence in subsequent litigation between the parties.").

■ Applying that principle here, it is clear that the references to the CFTC's findings are properly stricken from the Complaint. To the extent the Complaint describes the manipulative trading scheme,

those allegations simply recast the CFTC's findings and are derived wholesale from the CFTC Order. For example, Paragraph 81 alleges that the CFTC's "charges involved what the CFTC found to be a 'manipulative scheme' in NYMEX platinum and palladium futures contracts traded in this District during the period of 'at least November 2007 through May 2008.'" (Compl. ¶ 81.) Similarly, Paragraph 83 asserts that "[a]s the CFTC's holding that the Moore Capital Defendants violated Section 9(a)(2) shows, in devising, entering or causing others to enter these 'bang the close' orders, Defendant Pia was, in fact, an employee, agent and other person acting on behalf of each of the Moore Defendants." (Compl. ¶ 83.) These allegations are paradigms of the type of pleading prohibited by *Lipsky* and its progeny.

Although the CFTC Order included certain factual findings, it nevertheless was the product of a settlement between the CFTC and the Respondents, not an adjudication of the underlying issues in the CFTC proceeding. Plaintiffs are therefore prohibited from relying on the CFTC Order to plead the "underlying facts of liability." *United States v. Gilbert,* 668 F.2d 94, 97 (2d Cir.1981); *see Footbridge Ltd. v. Countrywide Home Loans, Inc.,* No. 09 Civ. 4050(PKC), 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) ("[D]efendants' motion to strike is granted with respect to the allegations ... insofar as they are based on pleadings, settlements, and government investigations in other cases."); *Sec. Investor Prot. Corp.,* 234 B.R. at 336 (striking references to an SEC consent order); *Dent v. U.S. Tennis Ass'n, Inc.,* No. 08 Civ. 1533(RJD)(VVP), 2008 WL 2483288, at *3 (E.D.N.Y. Jun. 17, 2008) (striking references to a settlement with the New York Attorney General).

■ Plaintiffs' assertion that the CFTC Order is material to their claims because it will be admissible at trial is mistaken. The admissibility of "a civil consent decree" such as the CFTC Order "is governed by Fed.R.Evid. 408." *United States v. Gilbert,* 668 F.2d 94, 97 (2d Cir.1981). Rule 408 "bars evidence of a compromise to prove liability for the claim, but specifically permits use of such evidence for other purposes." *Gilbert,* 668 F.2d at 97. Here, in pleading the facts supporting their claims, Plaintiffs quote extensively from the CFTC Order, indicating an express purpose to employ the CFTC Order to prove liability. Indeed, that purpose is manifest in Plaintiffs' argument that this Court should accord *Chevron* deference to the CFTC's findings of liability. (*See* Pls.' Opp'n at 24 (citing *Chevron U.S.A., Inc. v. Natural Res. Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).)

Moreover, Plaintiffs' reliance on *Securities & Exchange Commission v. Pentagon Capital Management PLC* is misplaced. There, Judge Sweet found that a consent decree with the SEC was admissible under Rule 408 because it was being offered not "to establish liability against the parties who settled[,] but to offer evidence as a shield" against the SEC's allegations. *Pentagon Capital,* No. 08 Civ. 3324(RWS), 2010 WL 985205, at *4 (S.D.N.Y. Mar. 17, 2010). Moreover, it was the defendants, not plaintiff, who sought admission of the consent order in that action. *Pentagon Capital,* 2010 WL 985205, at *4. Here, Plaintiffs proffer no similar defensive purpose regarding the admissibility of the CFTC's findings.

Finally, contrary to Plaintiffs' contention, Fed.R.Evid. 803(8)(C) does not provide an independent basis for admissibility of the CFTC Order. Rule 803(8)(C) provides that government records including "factual findings resulting from an investigation made pursuant to authority granted

by law" are not hearsay, "unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(C). But this rule merely creates an exception to the normal hearsay rules excluding out of court statements offered for the truth. The CFTC Order's admissibility is governed by Rule 408, which, as discussed above, excludes Plaintiffs' intended use.

Accordingly, Defendants' motion to strike the references to the CFTC Order in paragraphs 1–3, 5, 9, 31(c), 35, 80–91, 101, 116, 119–21, and 170 is granted. However, Defendants also seek to strike allegations that do not appear to reference the CFTC Order directly. For example, Defendants appear to object to the inclusion in some paragraphs of the terms "bang the close," "frequent," and "often." The term "bang the close" is a colloquial trading term that need not be stricken from the Complaint. To the extent that the Complaint purports to quote terms such as "frequent" or "often" directly from the CFTC Order, they are stricken. Defendants' motion to strike the references in paragraphs 31(a) and (b), 77, 94–97, 114, 122–23, 125, 127–28, 130–31, 134, 138–40, 181, 187, 210, 214–15, 217 is otherwise denied.[2]

## II. Allegations Absent the CFTC Order

Defendants argue that the Complaint fails to adequately plead facts supporting nearly every element of Plaintiffs' claims. However, because this Court has stricken the references to the CFTC Order, many of the parties' arguments are difficult to evaluate. Indeed, those references permeate the Complaint, and their absence denudes the Complaint of the specifics of the alleged manipulative trading scheme. This Court will address the elements of

Plaintiffs' claims only to the extent necessary to illustrate that Plaintiffs' reliance on the CFTC Order requires dismissal of their claims. To avoid an advisory opinion, this Court declines to address the parties' arguments regarding many of the other disputed elements at this time. This Court notes, however, that certain of the parties' arguments relate to allegations that do not rely on the CFTC and are therefore subject to resolution on this motion.

## III. Motion to Dismiss Standard

On a motion to dismiss, a court must accept the facts alleged as true and construe all reasonable inferences in plaintiff's favor. *ECA Local 134 IBEW Joint Pension Trust Fund of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 196 (2d Cir.2009). In order to survive a motion to dismiss, "[a] complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quotations and citation omitted).

## IV. Sherman Act Claim

Defendants contend that Plaintiffs' Sherman Act claim is deficient because it fails to allege (1) a conspiracy among independent economic actors; (2) an agreement to manipulate prices; and (3) antitrust standing. Additionally, MF Global argues for dismissal of the Sherman Act claim on the grounds that the Complaint fails to plead allegations specific to MF Global.

---

**2.** This Court expresses no view concerning Defendants' argument that Plaintiffs disregarded their obligations under Fed.R.Civ.P. 11 by relying on the CFTC Order.

## a. Conspiracy Among Independent Actors

"Under Section 1 of the Sherman Act, 'every contract, combination ..., or conspiracy, in restraint of trade or commerce ... is ... illegal.' 15 U.S.C. § 1. The crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir.2010).

In *American Needle, Inc. v. National Football League*, the Supreme Court examined the question of when the conduct of affiliated entities "must be viewed as that of a single enterprise for purposes of § 1." *Am. Needle, Inc. v. Nat'l Football League*, — U.S. ——, 130 S.Ct. 2201, 2208, 176 L.Ed.2d 947 (2010) (quotations omitted). The Court observed that it has "long held that concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities." *Am. Needle*, 130 S.Ct. at 2209. Rather, conduct by legally related entities can violate § 1 when it stems from an agreement among "separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore a diversity of entrepreneurial interests." *Am. Needle*, 130 S.Ct. at 2210, 2212 (quotations and citations omitted). This inquiry is one of "competitive reality" that ultimately examines "whether the agreement joins together independent centers of decisionmaking. If it does, the entities are capable of conspiring under § 1 ...." *Am. Needle*, 130 S.Ct. at 2212 (quotations and citations omitted).

Here, the Complaint alleges an agreement to manipulate the prices of platinum and palladium futures among the Moore Defendants, Pia, and MF Global. Defen-dants argue that the Moore Defendants and Pia are incapable of conspiring with each other for § 1 purposes because the Moore Defendants are affiliates of one another and Pia is merely their employee. Defendants also argue that MF Global could not have been pursuing an economic interest apart from the Moore Defendants because it allegedly acted only as their agent.

In evaluating Plaintiffs' conspiracy allegations, this Court declines to hold that the Moore Defendants are incapable of conspiring with each other merely by virtue of their legal affiliations. Such a holding would contravene the Supreme Court's directive in *American Needle* that "§ 1 does not turn simply on whether the parties involved are legally distinct entities." 130 S.Ct. at 2209; *see In re Sulfuric Acid Antitrust Litig.*, 743 F.Supp.2d 827, 884 (N.D.Ill.2010) (noting that courts have found that "related entities can conspire with each other" and that "[t]he reasoning ... elaborated on by *American Needle* supports that conclusion").

That conclusion aside, the Complaint nevertheless fails to include plausible allegations of an agreement joining together "independent centers of decisionmaking." *Am. Needle*, 130 S.Ct. at 2212. The Complaint's allegations concerning the origins of the manipulative trading scheme are perplexing. In some paragraphs, the Complaint appears to describe a top-down scheme originating from the Funds by alleging that they "acted through [their] agents and [the Advisors]," (Compl. ¶¶ 32–33), and that Moore Capital, the Advisors, and Pia "were the agents or other persons acting on behalf of the ... Funds," (Compl. ¶ 176). But it states elsewhere that the *Funds* "were controlled and managed by the Moore Defendants." (Compl. ¶ 127.) These allegations are contradictory. Moreover, the latter statement is non-

sensical. By defining the "Moore Defendants" as a group of entities that includes the Funds, Paragraph 127 alleges enigmatically that the Funds controlled themselves. *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F.Supp.2d 371, 405 (S.D.N.Y.2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent. . . ."). And to infuse still more dissonance into the allegations, at times the Complaint indicates that the manipulative trading scheme was driven by Pia, with his intent imputed to the Funds. (Compl. ¶¶ 31(c), 128–31.)

Ultimately, these convoluted allegations of a conspiracy fail to allege the union of independent centers of decisionmaking. Even accepting what appears to be the Complaint's main theory—that the Funds controlled the activities of the others [3]—it essentially pleads that the manipulative conduct was born of a single source. The other entities conducting the manipulative trading acted as mere agents. (*See, e.g.,* Compl. ¶ 87(f) (alleging MF Global "acted as Defendants' agent in entering its orders to the NYMEX floor for execution during the last ten seconds or last moments of trading in NYMEX platinum and palladium futures contracts").) The Complaint's emphasis on this principal-agent relationship is counterintuitive to the notion that an agreement among Defendants joined together independent decisionmaking centers. *See Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*, 516 F.Supp.2d 270, 291 n. 6 (S.D.N.Y.2007) ("[T]he fact that the amended complaint does not distinguish between the compa-

nies in any of the substantive allegations demonstrates . . . that the companies' objectives are common, not disparate, and that their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.") (quotations omitted).[4]

b. *Agreement to Fix Prices*

■ "A plaintiff alleging a § 1 violation must demonstrate (1) an agreement or concerted action among the defendants in the (2) unreasonable restraint of trade." *In re Currency Conversion Fee Antitrust Litig.*, 773 F.Supp.2d 351, 366 (S.D.N.Y. 2011). "While a plaintiff is not required to show the existence of a written agreement to prove a § 1 claim, 'it is generally believed that an express, manifested agreement involving actual, verbalized communication, must be proved in order for a price-fixing conspiracy to be actionable under the Sherman Act.'" *In re Currency Conversion*, 773 F.Supp.2d at 366 (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir.2002)).

Here, Plaintiffs' central argument is that the agreement among Defendants to manipulate the prices of platinum and palladium futures contracts is "[e]videnced [b]y [t]he CFTC's [f]indings." (Pls.' Br. at 33.) Indeed, the allegations potentially giving rise to an inference of an agreement quote extensively from the CFTC Order. (*See* Compl. ¶¶ 79–91.) Because those allegations have been stricken, Plaintiffs' antitrust claim is dismissed for the independent reason that it fails to allege the existence of an agreement among Defendants.

---

**3.** That conclusion is teased in part from Plaintiffs' brief, which argues that "the Moore Manager Defendants and Defendants Pia and MF Global were all persons acting on behalf of or even as agents for the [Funds]." (*See* Pls. Br. at 25.)

**4.** This is bolstered by the fact that Plaintiffs failed to name MF Global as a participant in their Sherman Act claim. (Compl. ¶¶ 192–98.)

#### c. *Antitrust Standing*

Given the above bases for dismissal of Plaintiffs' antitrust claim, this Court declines to address the parties' arguments regarding antitrust standing at this time.

### V. *CEA Claim*

 The CEA prohibits any person from "manipulat[ing] or attempt[ing] to manipulate the price of any commodity...." 7 U.S.C. § 13. While the term "manipulate" is undefined, "[t]he [CFTC] and the courts have developed the following four-factor test to determine whether a [defendant] has manipulated prices: (1) [t]he [defendant] had the ability to influence market prices; (2) [t]he [defendant] specifically intended to do so; (3) [t]he 'artificial' prices existed; and (4) [t]he [defendant] caused the artificial prices." *In the Matter of DiPlacido*, CFTC No. 01–23, 2008 WL 4831204, at *25 (C.F.T.C. Nov. 5, 2008); *accord In re Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d 513, 530 (S.D.N.Y.2008) (describing the elements of a "market manipulation" claim); *see also Frey v. Commodity Futures Trading Comm'n*, 931 F.2d 1171, 1175 (7th Cir.1991) (adopting the elements promulgated by the CFTC). Defendants argue that the Complaint fails to adequately plead facts supporting each element of a manipulation claim.

#### a. *Scienter*

 "[I]n order to prove the intent element of a manipulation" claim, a defendant must have acted "with the purpose ... of causing ... a price or price trend in the [particular] market that did not reflect the legitimate forces of supply and demand...." *Indiana Farm Bureau Cooperative Ass'n, Inc.*, CFTC No. 75–14, 1982 WL 30249, at *7 (CFTC Dec. 17, 1982); *accord U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F.Supp.2d 523, 532 (S.D.N.Y.2008). According to Plaintiffs, the Complaint alleges the intent to manipulate prices because it "plead[s] that the CFTC Order both finds and concludes that Defendant Pia had specific intent to manipulate." (Pls. Opp'n at 17.) Similarly, Plaintiffs argue that this Court should accord *Chevron* deference to the CFTC's findings concerning the intent element of a manipulation claim. Because this Court has stricken from the Complaint all references to the CFTC Order, these arguments fail.

The only remaining allegations suggesting an intent to manipulate prices concern the deletion of emails by certain of the Moore Defendants. However, this Court cannot conclude that such allegations alone give rise to an inference of manipulative intent. Accordingly, the Complaint fails to allege that any of the Defendants acted with requisite intent to manipulate the prices of platinum and palladium futures contracts.[5]

#### b. *Remaining Elements of the CEA Claim*

For the reasons stated above, this Court declines to address the parties' arguments regarding price artificiality, causation, and the ability to affect prices.[6] This Court also declines to address Defendants' void

---

5. This Court makes no determination at this time regarding whether Plaintiffs' CEA claim is governed by Fed.R.Civ.P. 8(a)'s pleading standard or the heightened pleading standard of Rule 9(b). Absent the allegations based on CFTC Order, the Complaint fails to plead manipulative intent even under Rule 8(a)'s more permissive standard.

6. Plaintiffs frequently assert the CFTC Order as the basis for their allegations concerning those elements. (*See, e.g.*, Pls. Br. at 4, 7 (arguing that the CFTC's findings establish causation).)

for vagueness challenge to § 25(a)(1)(D) of the CEA because it was not squarely presented to the Court. (*See* Letter from the United States Department of Justice to the Court dated July 8, 2011 at 1 (declining to intervene because "it does not appear that there is a direct challenge to the CEA's constitutionality at this juncture in the proceedings").)

#### c. *Aiding and Abetting Liability*

 Section 25 of the CEA establishes liability for any person who aids and abets a violation of the CEA. 7 U.S.C. § 25(a)(1). To establish aiding and abetting liability, "a plaintiff must prove that the defendant (1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective." *In re Natural Gas Commodity Litig.*, 337 F.Supp.2d 498, 511 (S.D.N.Y.2004); *accord Damato v. Hermanson*, 153 F.3d 464, 473 (7th Cir.1998). Here, because the Complaint fails to allege the requisite intent of any primary actor, there can be no aiding and abetting liability as a matter of law. *See Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 (5th Cir.1996) ("In order to recover damages from a secondary party in an action for 'aiding and abetting' liability under the Commodities Exchange Act, a plaintiff must first prove that a primary party committed a commodities violation."). This Court declines to address the parties' remaining arguments regarding the sufficiency of Plaintiffs' aiding and abetting allegations at this time. Those allegations rely largely on the CFTC's findings (which are stricken) and may, though not necessarily, state a claim if Plaintiffs replead similar facts.

#### d. *Respondeat Superior*

 "[T]he liability of a principal for the acts or conduct of his agent is governed by [§ ] 2(a)(1)[ (B) ] of the CEA...." [7] *Guttman v. Commodity Futures Trading Comm'n*, 197 F.3d 33, 39 (2d Cir.1999). Such liability may be imposed where (1) the agent participated in the alleged unlawful activity and (2) his actions were within the scope of his employment or office. *Guttman*, 197 F.3d at 39. While some courts "require plaintiffs to demonstrate control in order to find [that] an agency relationship exists," *In re Amaranth Natural Gas Commodities Litig.*, 711 F.Supp.2d 301, 307 (S.D.N.Y. 2010), the Court of Appeals has held that a principal "need not actually have participated in [the agent's] wrongful conduct or have controlled [the agent's] behavior; for the purpose of imposing liability under [§ ] 2(a)(1)[ (B) ], it is enough if [the agent] was 'acting for' [the principal] in executing the illegal trades." *Guttman*, 197 F.3d at 39. Moreover, § 2(a)(1)(B) "applies to torts committed by agents who are not necessarily employees." *Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963, 966 (7th Cir.1986).

 Defendants contend that the Complaint fails to allege a principal-agency relationship among any of the Defendants other than Pia and Moore Capital because it does not "show how each alleged principal exercised 'complete control' over its alleged agent." (Defs. Br. at 31.) While this may be true, the Court of Appeals has held that the CEA imposes no such requirement on a plaintiff pleading a respondeat superior theory of liability. Rather, "it is enough if [Pia] was 'acting for' [the Moore Defendants] in executing the illegal trades." *Guttman*, 197 F.3d at 39. And

---

**7.** Following *Guttman*, the provision under the CEA governing principal-agent liability was moved to 7 U.S.C. § 2.

this is exactly what the Complaint alleges. (*See, e.g.*, Compl. ¶¶ 31, 175 (stating that Pia was the "head of the execution desk of the Moore Defendants" and "entered the manipulative orders for them"). Similarly, the Complaint alleges that MF Global accepted and entered the Moore Defendants' manipulative trades in its capacity as a futures commission merchant. Even under Rule 9(b)'s heightened pleading standard,[8] these allegations are sufficient to withstand a motion to dismiss on the issue of respondeat superior liability. *Cf. Gary Glass and Zoltan (Lou) Guttman, Respondents*, 1996 WL 518121, at *9 (CFTC Sept. 11, 1996) ("It is generally known that [§ 2(a)(1)(B)] is grounded in the theory of common law respondeat superior, yet intended to reach a wider range of relationships.") (cited favorably in *Guttman*, 197 F.3d at 39).

Accordingly, Plaintiffs § 2(a)(1)(B) claim fails only to the extent that it does not adequately allege that Pia and MF Global engaged in unlawful activity. It is not deficient (as Defendants argue) for failure to allege complete control.

#### e. *Control Person Liability*

■ In their "Second Claim," Plaintiffs allege that "each of the ... Defendants is liable as a control person" under § 13(b) of the CEA. (Compl. ¶ 178.) Defendants contend, however, that Plaintiffs lack standing to bring a claim based on "control person" liability. This Court agrees. Section 13(b) "unambiguously provides for an administrative forum, that is, the [CFTC], to impose sanctions upon principals who control agents engaging in prohibited activities." *Michelson v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 619 F.Supp. 727, 739 (S.D.N.Y.1985). "[T]here exists no private right of action under [§ ] 13(b) of the CEA." *Michelson*, 619 F.Supp. at 739; *ac-*

*cord In re Amaranth Natural Gas Commodities Litig.*, 587 F.Supp.2d 513, 546 (S.D.N.Y.2008) ("The plain language of [§ 13(b) ] limits its application to actions brought by the CFTC"). Accordingly, Plaintiffs' Second Claim is dismissed with prejudice to the extent it is based on a "control person" theory of liability.

#### f. *Loss Causation*

Relying on the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), Defendants argue that the Complaint fails to allege facts demonstrating that the manipulative trading scheme was the proximate cause of Plaintiffs' losses. Specifically, Defendants argue that "claims predicated on ... trades which were opened and closed entirely during the Class Period [are] ... insufficient because any artificiality present at the time positions were opened ... would have been present also when these positions were closed ..., thereby offsetting any potential damage." (Defs. Br. at 27.) This is a formulation of *Dura's* "loss causation" principle, which recognizes that if a purchaser pays an artificially inflated price based on a misrepresentation to the market but "sells [his] shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Dura*, 544 U.S. at 342, 125 S.Ct. 1627.

While this explanation is persuasive in the context of information hidden from the market,

> "[m]anipulative conduct is different. A market manipulation is a discrete act that influences stock price. Once the manipulation ceases, however, the information available to the market is the same as before, and the stock price

---

**8.** As stated above, this Court does not decide

the governing pleading standard at this time.

gradually returns to its true value. For example, suppose that a bank manipulates the market for a stock by engaging in "wash sales," fictitious trading for the purpose of creating a false appearance of activity. By creating an appearance of increased trading volume, wash sales may drive up the price of a security. Once the wash sales cease, ordinary trading resumes. The spectre of wash sales may continue to affect the stock price for some time as investors recall the recent increased activity and observe the higher price; over time, however, the security will fall back to its true investment value.

In market manipulation cases, therefore, it may be permissible to infer that the artificial inflation will inevitably dissipate.... It is that dissipation—and not the inflation itself—that [may] cause[ ] plaintiffs' loss.

*In re Initial Public Offering Sec. Litig.,* 297 F.Supp.2d 668, 674–75 (S.D.N.Y.2003).

■■■ This analysis demonstrates the infirmity in Defendants' reliance on *Dura.* The trading scheme described in the Complaint relied on large trades in an illiquid market in the final seconds of the close. Their effect could have been dissipated depending on the timing of both Defendants' trades and Plaintiffs' transactions in the market. Moreover, although courts frequently look to the securities laws in deciding claims under the CEA, *Dura's* application outside the securities law context has been questioned. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 183 (2d Cir.2007) ("*Dura's* conclusion that overpayment alone cannot prove loss causation ... is based on the tailored application of these principles set out by the Supreme Court in

the securities context. Such application does not govern here."); *Kohen v. Pacific Inv. Mgm't Co. LLC,* 244 F.R.D. 469, 475 (N.D.Ill.2007) (declining to apply *Dura* to class certification issues under the CEA because it was "not a securities fraud case and, thus, the elements of proof [were] different"); *see also In re Energy Transfer Partners Natural Gas Litig.,* No. 07 Civ. 3349(KPE), 2009 WL 2633781, *11 (S.D.Tex. Aug. 29, 2009) (discussing authority for and against *Dura's* applicability to claims under the CEA).[9] Accordingly, without passing on the sufficiency of Plaintiffs' substantive allegations, this Court finds that *Dura's* loss causation principles do not apply to the type of manipulative conduct alleged here.

## VI. *RICO Claim*

■■■ To establish RICO liability, "a plaintiff must show '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *DeFalco v. Bernas,* 244 F.3d 286, 306 (2d Cir.2001) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). "The requirements must be met as to each individual defendant." *M'Baye v. New Jersey Sports Production, Inc.,* No. 06 Civ. 3439(DC), 2007 WL 431881, at *6 (S.D.N.Y. Feb. 7, 2007); *accord DeFalco,* 244 F.3d at 306. Here, Defendants challenge the Complaint's RICO allegations on three grounds: (1) it fails to allege RICO continuity; (2) it fails to allege specific predicate acts; and (3) Plaintiffs' lack RICO standing.

As to the second argument, Plaintiffs' allegations concerning predicate acts fail for two reasons. First, Plaintiffs argue that those allegations are sufficient because they (1) "plead the RICO scheme,

**9.** Defendants' reliance on *Minpeco, S.A. v. Conticommodity Servs., Inc.,* 676 F.Supp. 486, 490 (S.D.N.Y.1987) is misplaced. That decision addressed only the plaintiff's obligation to prove losses at trial, not the adequacy of the complaint's allegations.

*see generally* ¶¶ 31(a), 79–82, 85(a); ... [ (2) ] explain the nature and manipulation of the trades[;] ¶¶ 2–3, 70–74, 82–100[; and (3) ] ... append to the CFTC's findings the transactions [that] occurred at least during the [Class P]eriod[,] ¶¶ 1–5, 80–91." (Pls. Br. at 39.) However, Plaintiffs' argument and their citations illustrate that the predicate act allegations are based heavily on portions of the Complaint that have been stricken because of their reliance on the CFTC Order.

Second, even if those allegations survived, Plaintiffs rely impermissibly on group pleading to allege the existence of predicate acts underpinning their RICO claim. While Plaintiffs dispute this conclusion by pointing to Paragraphs 35, 80, and 91 as evidence that the Complaint identifies "individual actors," those paragraphs do nothing to differentiate the conduct of the various Defendants other than Pia. Rather, they primarily refer to the CFTC's findings, which pertain to only some of the Defendants. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young,* No. 91 Civ. 2923(CSH), 1994 WL 88129, at *20 (S.D.N.Y. Mar. 15, 1994) ("The allegations' impermissible failure to distinguish between [certain] Defendants mandates dismissal under both Rule 9(b) and Rule 8(a). The Complaint never specifically alleges the nature of each defendant's participation in the allegedly fraudulent scheme. It merely sets forth a number of so-called "Racketeering Acts" committed by [those] Defendants, ... and adds a catalog of communications by mail or interstate wires alleged to have been made or caused to be made by the[m].…"). Accordingly, Plaintiffs' RICO claim is dismissed for failure to adequately plead predicate acts.

Because the parties' arguments regarding RICO standing and continuity are substantially intertwined with the allegations based on the CFTC Order, this Court declines to address those arguments at this time.

### CONCLUSION

For the foregoing reasons, Defendants' motion to strike is granted in part and denied in part, and their motion to dismiss the Complaint for failure to state a claim is granted. Pursuant to Fed.R.Civ.P. 15, Plaintiffs are granted leave to replead their allegations in a manner consistent with this Memorandum and Order. The Clerk of the Court is directed terminate the motion pending at Docket No. 55.

SO ORDERED.